# David H. Harts *et al.*

## *v.*

# Jefferson Brown *et al.*

1. Corporation—*director may deal with same as a stranger.* A director or stockholder of a private corporation may trade with, borrow from, or loan money to the company of which he is a member, on the same terms and in like manner as other persons; but where a director loans money to his corporation, taking a deed of trust to secure the same, he must act fairly, and be free from all fraud and oppression; and if, in so doing, he acts for the interest of the company, and imposes no unfair or unreasonable terms, the security may be enforced the same as if given in favor of any other person.

2. Same—*directors may purchase indebtedness and property of company the same as a stranger.* The managers or directors of a private corporation are not trustees of its property in such a sense as to disable them from purchasing the property and stock belonging to it, with the same effect as though they were not managers or directors. They will have the right to purchase the bonds or other indebtedness of the company.

3. Same—*when purchase by directors will be in bad faith.* If the corporation has money, property, or assets that can be converted into money, with which to redeem its property from a judicial sale, or from the lien of a deed of trust, then it seems that a purchase of the certificate of purchase, or the bonds of the company, as a means by which to acquire its property, by the directors, would be in bad faith, and the title thus acquired would not be sustained in equity.

4. But where the company is insolvent, and has no means to discharge its indebtedness or redeem property sold, and the directors give all the stockholders an opportunity of making advances to relieve the company of its embarrassment, which they refuse to embrace, the directors will have the right to purchase such indebtedness and acquire title to the corporate property, by enforcing its sale under a deed of trust given to secure such indebtedness, and the other stockholders will have no right to complain.

5. Same—*right to sell, under deed of trust, property after satisfaction.* Where the lands of a coal company, its shaft, railroad tracks, rails and mining rights, were sold under a deed of trust given to secure the payment of its bonds, and brought a sum sufficient to pay the bonds, and the company owed other debts, it was *held*, that it was not only the right, but the duty of the directors to sell the remaining property to meet the other liabilities of the company, and that they might authorize its sale at auction by the party selling under the trust deed.

6. FIDUCIARY—*purchasing at party's own sale.* Where the property of a coal company was sold under a deed of trust given by the company, and, after a sum sufficient to satisfy the trust deed was realized, the remaining property was also sold, by the consent and direction of the directors, and they became the purchasers of all the property at such sale: *Held*, that the sale, after enough was raised to pay the debts secured by the trust deed, was void, because the directors as to such property were the vendors, and they could not purchase of themselves or at a sale made by their authority.

7. SUBROGATION. Where the directors of an incorporated company purchased all the property of the company at a sale under a deed of trust, the main part of which was sold first in satisfaction of the debts secured, and the balance, by their direction, to realize money to pay other indebtedness not secured, and which was so applied by them, while it was held that the sale as to the last was void, yet, on bill by the original stockholders against the directors and the new corporation formed by them, to set aside the sale, it was also *held*, that the directors. having paid the debts of the old company, were entitled in equity to be subrogated to the rights of the creditors whose debts they paid, and that an account should be taken of the value of such property so sold after satisfaction of the trust deed, and the balance, after deducting the amount paid by them on the debts, should be taken as a fund for distribution among the stockholders of the original company.

APPEAL from the Circuit Court of Logan county; the Hon. LYMAN LACEY, Judge, presiding.

This was a bill in chancery, filed by Jefferson Brown, Ezra Boren, John Howser, Mark W. Barrett, William F. Ryan, Abner C. Boyd, Joel B. Paisley, Hamilton Tibbets, Jesse Ferbis, James M. Howser, Samuel Waters, Robert B. Latham, Malon R. Hall, Eli Downey, J. Shelton Randolph, Martin Spitley and John Hukill, against David H. Harts, Frank Frorer, Silas Beason, Ambrose Miller and the Lincoln Coal Company. The object of the bill, the facts of the case and the proceedings had, are stated in the opinion of the court, so far as is necessary to an understanding of the case.

Mr. E. D. BLINN, and Messrs. ROWELL & HAMILTON, for the appellants.

Messrs. HOBLITT & FOLEY, and Messrs. NELSON & ROBY, for the appellees.

Mr. CHIEF JUSTICE WALKER delivered the opinion of the Court:

The Lincoln Coal Company was first organized in the year 1867, under the general incorporation law of this State, but afterwards became incorporated under a special charter adopted at the session of the General Assembly of 1869. The stock was divided into five hundred shares of $100 each. Three hundred were sold and paid for in full, but the remaining two hundred were apportioned among the stockholders according to the number of shares each held, upon their paying $30 on each share. Three shares were subsequently forfeited, leaving four hundred and ninety-seven shares to represent the capital stock of the company.

The organization proceeded to sink a shaft, and to prepare for mining coal. The money received on the sale of shares of stock was expended, and debts to the amount of from $23,000 to $33,000 were contracted by the company. Bonds of the corporation were issued and sold to Musick to the amount of $9400, and a trust deed was executed to him on the property of the company to secure the payment of the same.

These bonds matured about the first of August, 1871, and the greater portion of them were held by Musick and Hall, who demanded payment, and refused to extend the time unless personal security was given. Prior to that time, the property had been sold under a decree for a mechanic's lien for $2000, and there was other indebtedness, as it is claimed, over the amount of assets to meet the same.

Thereupon the directors called a stockholders' meeting, and the secretary gave each shareholder a notice thereof and of the object of the meeting. It was held on the first of September, when a portion of the stockholders attended, and the condition of the affairs of the company was laid before them, and a proposition was submitted that each shareholder contribute his proportion of the amount necessary to relieve the

company from this indebtedness, and they were requested to severally pay such sums. The property was advertised and sold on the 23d of December, 1871, and Frorer became the purchaser, for the amount of the indebtedness of the company, for the use of all stockholders who should join in forming a new company, and contributing thereto in proportion to the stock held by them in the old company.

Before this sale was made, Musick and appellants entered into a written agreement that he should sell and transfer to them forty-three and one-third shares of stock, and assign to them fifty-two bonds of the company, of $100 each, with the interest thereon, and a promissory note executed by Frorer, Howser and Ezra Boren, to Musick, for $3000, with ten per cent interest; and that he would sell the property of the company, under and in conformity to the terms of the trust deed, as soon as possible after the first of August, 1871, and to execute proper deeds therefor.

Appellants, on their part, agreed to execute to Musick four promissory notes—one for $2400 and three for $2500 each—and to execute a mortgage on their interest in the coal company's property, to secure the payment of the money. They were to keep Musick harmless on account of an agreement in reference to the note he assigned to them, and free from liability to the coal company.

After the property was sold, and purchased by Frorer, appellants organized a new company, under the name of the Lincoln Coal Mining Company. They put in the property thus purchased at $80,000, and divided the stock among themselves, and have been operating it, with good profits and dividends, ever since.

Appellees filed a bill against appellants and Musick, claiming that the sale was fraudulent and void; that the company had no power to make the trust deed to any one, and especially to a director of the company, and that appellants wrongfully combined to compel a sale of the property, and to become the

purchasers, and thus defraud the other stockholders out of
their interest in the property.

Musick filed a cross-bill, alleging that he was induced to
sell his stock to appellants, by false and fraudulent repre-
sentations. Appellants claim that the company was hope-
lessly insolvent, and without means to pay their debts, and
without credit, and that the property had been sold under a
decree of court, and that the time for redemption would soon
expire, and that, for the purpose of saving the means they
had already embarked in the enterprise, they determined to
become the purchasers, not at the sum due Musick, but at a
price which would pay all the creditors of the company,
and then organize a new company, giving to all the stock-
holders the opportunity to participate in the new organization,
by contributing their ratable proportion of the sum necessary
to pay the purchase price they had paid for the property.

On a hearing, the court below dismissed Musick's cross-
bill, but granted the relief sought by complainants in the
original bill. The court decreed a rescission of the sale, and
stated the principles upon which an account should be stated,
and referred it to the master to state the account. From that
decree defendants prosecute this appeal, and assign various
errors.

Had the directors legal authority to borrow money, and to
execute a trust deed for its security on the property, or a
mortgage with a power of sale? Their charter authorizes
them to contract and be contracted with; to sue and to be
sued. And the eleventh section of their charter expressly
confers the power to borrow money, and to issue notes or
bonds for the same, secured by mortgage. See Private Laws
1869, vol. 2, p. 837. This, then, places the power beyond all
question.

Did the directors have power to borrow money of one of
their number, and execute to him a mortgage on the corpo-
rate property, with a power of sale? We have never known
it questioned that a director or stockholder may trade with,

borrow from or loan money to the company of which he is a member, on the same terms and in like manner as other persons. He, then, had power to loan money to the company, and they became liable to pay the same. But in doing so, he must act fairly, and be free from all fraud and oppression; and he, in so doing, must act for the interest of the company, and impose no unfair or unreasonable terms.

In this case, we perceive nothing unfair on the part of Musick. The company had expended all of their means, and had failed to realize their expectations, and had reached a point at which the enterprise must be abandoned unless means could be procured to further prosecute the work; and, so far as we can see, there was nothing reckless or unbusinesslike in effecting this loan for the time, at the rate of interest or on the security given. They all seem to be according to the usual course of business.

The loan, then, having been fairly made, for a proper purpose and on reasonable terms, we fail to perceive any reason why the debt could not be collected by a sale of a sufficient amount of the property to raise the necessary sum; but it is urged that the other directors had no legal right to purchase the indebtedness held by Musick, and to have the property sold to meet the obligations of the company held by them. Angell and Ames on Corporations, p. 214, lay it down as a rule, that "the managers or directors of a corporation are not trustees of its property in such a sense as to disable them from purchasing the property and stock belonging to it, with the same effect as though they were not managers or directors;" and such is undoubtedly the general usage with the directors of all corporations. In this case, appellants had the right to purchase the bonds of the company, and Musick's stock and the $3000 note; nor does the purchase, as made, raise a presumption of fraud, nor do we find any proven.

On the same grounds, and for the same reason, the purchase of the certificate of purchase, under the decree for the

mechanic's lien, was legal, and was as effective as if it had been thus acquired by a stranger. If the company had possessed money. or property, or any assets that could be converted into money, with which to redeem, and discharge the debts, then these purchases would have been in bad faith ; but there were no such means — the company was hopelessly insolvent, and its final dissolution was at hand. The stockholders had been called together, and they were urged to make advances in proportion to the stock they severally held, and thus relieve the company and preserve its existence, but this they refused to do; and as it could not be preserved, and must come to an end by a sale under the power in the trust deed, no reason is perceived why appellants might not become the purchasers at the sale.

They were under no moral or legal obligation to advance their own means, pay the debts and preserve the property for the use of the other shareholders, who had declined to join in making *pro rata* advances to relieve it from debt. Appellants seem to have acted fairly, as they purchased at a sum sufficient to pay all the debts of the company. They chose to do so rather than make an effort to obtain all of the property for the debts secured by the trust deed and the certificate of purchase. On the contrary, they gave many thousand dollars more, that honest creditors might be fairly paid, and the company wrong no one. This does not have the appearance of fraud. Appellants had faith that the enterprise could be carried out with success, and that they could thus save the means they had advanced, but appellees, by the course they adopted, manifested an entire want of confidence in its ultimate success. They were even offered the opportunity to come in, for a considerable period afterwards, and share in the new enterprise, by advancing a ratable portion ·of the means, but they all declined; but when success was achieved, they then saw the advantages they had lost, and then sought to set aside the sale and have the property restored to the old company, and thus reap the benefits arising

from the enterprise and means advanced by others. To do so, they should show fraud or a want of power to make the sale or the purchase by appellants, neither of which has been done.

It is next urged that the sale was excessive; that when property sufficient to pay the bonded indebtedness had been sold, the sale should have been stopped. The first offered and sold were the lands, shaft, railroad tracks, rails and mining rights, etc., which were bid in at $11,000, which, it is contended, brought $70 more than the bonded debts. Conceding this to be true, still the principal thing was gone—the land, shaft, railroads and mining rights. The remaining property was but mere chattels, and could not be used by the company for the purposes for which they were acquired, unless other coal lands had been acquired, and a new enterprise undertaken.

When the company had thus been reduced to this situation, what was the plain, moral and legal duty of the directors? Surely every person would, without hesitation, say, sell the remainder of the property, and pay the debts of the company. This was dictated by every principle of justice and right. To have done otherwise, would have been unjust and indefensible.

There can be no doubt that the directors had the power to sell the property, either at public auction or at private sale; or, if they chose, they could, as they did, authorize Musick to sell it at auction. In this there is no lack of power; but the question is, whether they could become purchasers at their own sale. Until the bonded debts were satisfied, the sale was that of Musick for the benefit of the holders of the bonds, forty of which belonged to other parties than appellants; but when the sale amounted to a sufficient sum for that purpose, all that was subsequently sold was by Musick as the auctioneer of appellants, and they purchased at their own sale. This they could not do, any more than they could fix a price on the property, and appropriate it to their own use, which the

law has never sanctioned with persons occupying the relation they did to the stockholders. The sale, then, of property over and above what was necessary to pay the bonded indebtedness, was void, inasmuch as it was purchased by the directors of the company.

But inasmuch as appellants have paid large sums of money to satisfy and discharge the indebtedness of the corporation, they have, in equity and at law, a right to have their money refunded; and in equity they should be subrogated to the rights of the creditors whose debts they have paid, and should, in the final settlement and accounting with the stockholders, have a credit for the sum thus paid; and they should be required to account for all property sold by Musick after he had sold a sufficient amount to pay off and discharge the bonds, at its value as may be shown by evidence to be heard on the question, and if the property was of greater value than the amount paid by them on the debts, the balance should be treated and held as a fund for distribution among the stockholders in the original company; or if the first company is in existence, and the shareholders desire to continue the organization, appellants should be required, after deducting their proportional share according to the amount of stock held by them, to pay over the remainder of such surplus to the directors of the original company. Appellees have resorted to equity to obtain their rights, and they must be required to do equity; and the distribution of the fund in the manner indicated, is equitable and just.

The decree of the court below is reversed and the cause remanded.

*Decree reversed.*