JOSEPH L. MINER v. THE BELLE ISLE ICE COMPANY ET AL.

*Corporations—Contracts with officers—Fraud—Equity jurisdiction.*

1. The question involved in this case is the power of a court of equity, in the exercise of its general equity jurisdiction, to wind up the affairs of a private corporation at the suit of a stockholder because of the gross abuse by a director, who was also president, treasurer, and manager, of his trust in contracting with the corporation and in managing its affairs, in which action the remaining stockholders acquiesced; which power is held to exist, and is exercised for reasons stated in the opinion, a reference to which is essential to a correct understanding of the case.

93 MICH.—7.

2. A court of equity has the power, in case of fraud, abuse of trust, or misappropriation of corporate funds, at the instance of a single stockholder, to grant relief, and compel restitution; and this, too, without any showing that the directors have been requested, or the corporation has refused, to act, where the holders of the majority of the stock control the directorate, and are themselves the wrong-doers. .

Appeal from Wayne. (Brevoort, J.) Argued May 11, 1892. Decided October 4, 1892.

Bill for a receiver and an accounting, and to wind up the affairs of the defendant corporation. Complainant appeals. Decree reversed, and one entered in this Court in accordance with the opinion, in which the facts are stated.

*John W. A. S. Cullen* (*William J. Gray*, of counsel), for complainant.

*George H. Prentis* and *John J. Speed*, for defendants.

McGRATH, J. Complainant and defendant Charles A. Lorman had been in the ice business in the city of Detroit, as partners, since 1869, each having an equal interest in the business. In January, 1874, the joint property was inventoried at $23,500. Miner put in the further sum of $1,500, and the Belle Isle Ice Company was organized, with a capital stock of $25,000, divided into 1,000 shares of $25 each. Lorman and Miner each held 435 shares, I. J. Carpenter held 30 shares, and Lorissa Carpenter 100 shares. In 1878 the capital stock was increased to $50,000, or 2,000 shares at $25 each. At that time the Belle Isle Ice Company absorbed the Wolverine Ice Company, and Robert Wench, Isaac Wench, Frank Hoadly, and H. C. Kibbee became stockholders. In 1881 Lorissa Carpenter, R. W. Wench, Isaac Wench, and Frank Hoadly filed a bill against

Miner and Lorman to have certain lands held by defendants decreed to belong to the corporation, to obtain an account of the rents and profits, to compel the payment over to the corporation of certain moneys which had been expended upon said lands, to compel the surrender of certain stock illegally issued to defendants, and the payment over of all moneys taken by defendants for their private use. The stock held by the Wenches and Hoadly was purchased by Lorman, and the suit was discontinued.

In the spring of 1882, Miner, who was then president of the company, complained of the loose manner in which Lorman, who was manager, was managing the affairs of the company, particularly respecting the handling of the ice tickets. It seems that tickets were sold by the company to customers for cash or due-bills. These tickets were exchanged with the drivers for ice. The drivers upon each trip would turn in what cash and tickets were received, and an account with each driver was kept upon slips. He was charged with the weight of his load of ice, and credited with the cash and tickets. The tickets were then placed in a drawer, which was kept for that purpose. The complaint was that Lorman would in the morning fill his pockets with these tickets, and dispose of them through the day for cash and due-bills, turn in certain cash at night, and keep the due-bills, in order, as he claims, to make further entries upon them. Miner insisted that the bookkeeper should keep an account of the tickets taken out and of the cash returned by Lorman, and of the due-bills. Lorman looked after the sales and distribution of the ice, and Miner looked to the filling of the ice-houses, and the shipment of the ice from the various ice-houses to the points where loaded into wagons for distribution; and each received a salary of $1,200 per annum. Bitterness grew out of Miner's complaint, and at Lorman's suggestion, in April, 1882, amended articles of association were filed, dividing the

2,000 shares as follows: Lorman 1,006, Miner 694, Lorissa Carpenter 259, W. K. Muir 4, G. H. Lothrop 10, H. L. Kanter 10, S. L. Miner 5, W. Sanderson 4, W. F. Linn 4, and George H. Prentis 4, shares. Linn was Lorman's nephew, and was but nominally a stockholder, holding his stock in trust for Lorman; and the evidence tends to show that Muir and Sanderson also held their stock for Lorman.

At the next stockholders' meeting, held April 3, 1882, Lorman, Miner, and Linn were elected directors. At the directors' meeting, held April 20, it was proposed to make Lorman president and superintendent at a salary of $4,000. Miner objected, moved to adjourn, and, upon the failure of his motion, he left the meeting. Afterwards, Linn and Lorman only being present, Linn moved that Lorman be elected president at a salary of $1,000 per year as president, and $3,000 as manager. Lorman seconded the motion, and Lorman and Linn voted "Aye." Sanderson was elected secretary at a salary of $1,000. No treasurer was elected, but Lorman has ever since acted as president, manager, and treasurer. At the directors' meeting held April 5, 1883, it was moved by Sanderson, and seconded by Muir, that Lorman be appointed general manager and superintendent at a salary of $4,000, "all voting 'Aye.'" At the meeting held May 28, 1884, Muir moved that Lorman be general manager at a salary of $4,000; seconded by Sanderson; and Muir, Lorman, and Sanderson voted "Aye." At the meeting held April 26, 1885, Muir moved that Lorman be general manager at a salary of $4,000; seconded by Sanderson; and Muir, Sanderson, and Lorman voted "Aye." In May, 1886, Muir moved that Lorman be general manager at a salary of $4,000; seconded by Sanderson; and carried. In June, 1888, Sanderson had died, and one Gray, to whom Lorman had assigned some stock, and who was a nominal owner holding for Lorman, was elected director. Muir moved, Gray seconded, and Lorman was again appointed

at a salary of $4,000. Miner was discharged from the employ of the company in May, 1882. The balance sheet for the year ending March 1, 1883, showed a net gain of over $9,000. For the next year, the balance sheet showed a net loss of $3,460. For the next year, a net loss of $2,878. For the next year, ending March 1, 1886, the balance sheet showed a net gain of $2,193, for the next year a net gain of $8,672, and for the next year a net gain of $1,712. No dividends have been declared since 1882. The salary account for the year ending March 1, 1883, was $6,287, and for each of the five years following it was $5,200.

When the company was formed, Lorman and Miner owned three parcels of real estate, upon which the ice-houses were located. The ice-houses were turned in to the company, but the title to the real estate was retained by Lorman and Miner, who were joint owners, and leased to the company. These three parcels may be designated as the "Dock Property," the "Steam-Power Property," and the "Creek Property." The company had leases of these parcels,—of the steam-power property for five years from January 1, 1881, at $1,000 per year, and of the creek property for the same term at $300 per year. The leases were renewable at the option of the company, and, in case the parties failed to agree as to rental value for the new term, two arbitrators were to be appointed to fix the rental. In May, 1883, the directors passed a resolution directing the purchase of Lorman's interest in these parcels of property, and Lorman conveyed his half interest to the company. The price paid for the dock property was $5,000, subject to half of a mortgage of $8,000; for the creek property $3,000, subject to half of a mortgage of $3,000; and for the steam-power property $5,000,—"in all, $13,000; cash down, $1,000, and the balance of $12,000 in payments of $1,000 each, payable, one September 24, 1883,

and one every four months thereafter, with interest at 7 per cent."

In July, 1883, Miner filed bills for the partition of the dock property and the steam-power property, and partition was had. The dock property was found to be incapable of subdivision. The directors ordered its purchase for the company, but Lorman, in December, 1884, bought it in at $15,725, of which sum $8,326.66 was paid upon the mortgage, $3,653.42 was paid to the company, and was held by Lorman and credited upon the company's $13,000 purchase, and $3,653.42 was paid to Miner. The steam-power property was divided, the east half being assigned to Miner, and the west half to the company, and the company paid Miner $400 for difference in value. The final decree was entered February 12, 1884. In March, 1884, the company reconveyed the steam-power property to Lorman for $5,000, the same price for which it had been sold by Lorman to the company 10 months before. Whatever the purpose or occasion of these transfers from Lorman to the company and from the company to Lorman, it appears that the company paid Lorman $10,000 for his half interest in the two parcels, it paid the expenses of the litigation, it paid $400 to Miner upon the partition of one parcel, and naturally the property would not depreciate; yet Lorman has the property, and the company has $8,653.42, or $1,746.58 less than it paid, and has paid its share of the expenses of the partition, and its solicitors. In 1887, the company reconveyed the interest in the creek property, which it had purchased from Lorman, back to him at $2,137.50, while it had paid $3,000 for the same property four years before, although it is insisted that the property had increased in value.

When the first five years under the leases of the creek and steam-power properties had expired, the company elected to renew, but neither Miner and the company, nor the arbitrators who were called in, could agree as to the

rental value; Miner claiming a rental of $300 for his share of the creek property, and $1,000 for his share of the steam-power property. The courts were appealed to, and the rental value of Miner's interest in the steam-power property was fixed by the court for five years at $500, and that of the creek property at $200. No steps were taken by arbitration or in court against Lorman, although he at that time owned one-half interest in the steam-power property. He was paid $850 per year for 1886 and 1887, and for 1888, 1889, and 1890 he received $1,000 per year, for his share of this property, and the only difference in value of the two shares, also fixed by the court, was $400, and this amount the company paid.

In September, 1885, Lorman bought what is known as the "Beniteau Property" for $3,500, and leased it to the company. For the year 1886 the company paid him $850 as rental for that property, for the year 1887 the sum of $800, and for 1888, 1889, and 1890 the sum of $1,000 per year; making a total in five years of $4,650 for property which he paid $3,500 for at the beginning of the term. The lease fixing the rental for the creek property at $500, and for the steam-power property at $1,000, was not made until May 21, 1888, although the rates above named had been paid in the *interim*.

After the discontinuance of the suit commenced by Lorissa Carpenter and others in 1882, Lorman agreed with Lorissa Carpenter to pay a certain percentage upon her stock annually, and from 1882 he has paid her, out of the company's funds, at least the sum of $1,590.93. Mr. Kibbee, her father, says that the arrangement was made in 1882, when they assumed the management. It was to pay interest on her stock, guarantee it, and whatever amount was advanced should be deducted, whenever dividends were to be paid, from the amount received by her in advance.

" Mr. Lorman said he would guarantee Mrs. Carpenter an

advance to help her along until the matter was settled, and I agreed to it. I said I would not commence another suit if he would secure her. The last payment was made, of $50, on Saturday last. At the time, the checks were made payable to her order, and the time came when Mr. Lorman wanted a receipt made for a certain purpose, but he said it was not satisfactory, and she gave him one instead. I took that matter home. I have not got it here. The understanding between me and Lorman was that, so long as these payments were kept up, we would not make any trouble in the company."

On cross-examination:

"*Q.* Mr. Lorman, in the payment of this money, and the agreement to pay this money, put it upon the ground that Mrs. Carpenter was a woman, and needy, and that amount of money could be advanced to her, and taken out when there was a dividend; was that not it?

"*A.* Yes, sir; it was a compromise to get her something.

"*Q.* He said she was needy, and acknowledged the fact, and you told him she was needy?

"*A.* Very likely.

"*Q.* And he acknowledged the fact?

"*A.* I do not remember that. I remember asking him to put this stipulation in writing, and he said it might affect him.

"*Q.* He would not put it in writing?

"*A.* No, sir.

"*Q.* Refused to put it in writing. But he did put it upon that ground,—that it could be paid in that way, and after, if there was a dividend, it could be deducted from the dividend? and that was the distinct understanding, too, —it should be taken out of any dividend?

"*A.* Yes, sir. I have embraced it in that little paper I gave you."

On re-direct:

"*Q.* At the time this arrangement was made with Mr. Lorman, the old suit in which Lorissa Carpenter was interested had gone down, as you express it. Now, can you locate more definitely the time when the arrangement was made?

"*A.* Soon after, in the spring of 1882, when he first started the management of it in his own name.

"*Q.* At the time this agreement was made, were Mr.

Lorman and Mr. Miner good friends, or broken with each other?

"*A.* They had broken with each other.

"*Q.* They had broken?

"*A.* Yes, sir. Mr. Lorman had got the business, all of the stock, substantially, except Mrs. Carpenter's and mine.

"*Q.* On your cross-examination, Mr. Kibbee, I think you stated that you requested Mr. Lorman to put this agreement in writing. Did you make such a request of him?

"*A.* Frequently.

"*Q.* And what was his answer?

"*A.* That it might affect him in this suit with Miner; and I recollect a remark he made, that it would stultify him. I think that is about the substance. I said as long as he would help Mrs. Carpenter right along, I would not put any blocks in the way; that is the conversation as nearly as I can recollect it."

In 1885 complainant filed a bill against the company, Lorman, Muir, Sanderson, and Linn making like charges, but the court below found that it was defective for want of parties, and it was dismissed. The present bill was afterwards filed.

Lothrop and Kanter appear to have transferred their stock to Miner, so that the stock was held, at the time of the commencement of this prcceeding, 960 shares by Lorman, 4 by Muir, 4 by Linn, 50 by John S. Gray, and 4 by Prentis, making a total of 1,022 shares. John S. Gray, Muir, and Linn are but nominal holders, and all three are directors. Of the balance, Miner held 708, W. J. Gray 1, John H. Seitz 10, and Lorissa Carpenter and Kibbee 259 shares.

Lorman makes no attempt to explain the payment of the $1,590.93 to Mrs. Carpenter. He does not deny that he is president, manager, and treasurer, and that his associates on the board of directors have no personal interest in the company. He says that the members of the board do what he tells them to do. He insists that his salary is not large or unreasonable; that he is doing the work of both Miner

and himself. There is no pretense that the business had increased in volume immediately after 1881, yet the salary account is more than double that year what it was before that, and Lorman is paying himself $1,600 more than was paid to both in 1881.

Miner testifies that since 1882 not over two or three annual meetings have been held, to his knowledge. That "about two years ago, I went down there myself, and two or three more, and it was postponed; that is, Mr. Lorman postponed it himself without calling the meeting to order at all; and then, at the time it was postponed to, I went over, but there was no meeting, but I heard it said he had a meeting in some other place. I have had no notice of any meeting since." Another witness says that at one time he held some stock, and tried to attend an annual meeting, but that the meeting was held in some secret place, and he was unable to attend. No explanation is attempted to be made of this by the defendant Lorman. He practically admits the allegations as to the method of dealing with tickets, but insists that he has turned over to the company all the proceeds, and that he was a check upon himself. The practical difficulty with his method is that there is no way of determining whether he did or did not turn over all the proceeds. The matter of accounting for these tickets was one of some importance to the company, and to the stockholders. The cash receipts from the sale of tickets averaged $14,500 annually for the years 1882 to 1887, inclusive. There was nothing unreasonable in a demand made by the president upon the manager that some system should be adopted in a matter of that importance. Loose methods of doing business are likely to provoke suspicion, are in themselves suggestive of dishonesty, and usually result in difficulty. Complainant gives this as the origin of the difficulty, and Lorman does not deny it.

Respecting the transfers of property, Lorman claims that

1882 had been a good year; that the directors thought, in view of the prospects, it would be well to own the property; that bad years followed, and the company was unable to keep up the stipulated payments; that the directors did order the purchase of the dock property at the partition sale, but it had no money with which to make the purchase; but that was as evident when it was ordered as it was when the property was bid in by Lorman. The net gain for the year 1882, which is said by Lorman to have been the good year, was $9,000, but the net gain for the year 1886, ascertained March 1, 1887, was $8,672; yet the creek property was deeded back to Lorman, after this result had been ascertained, at $2,137.50, just $862.50 less than the company had paid for it four years before.

He admits that he made $1,200 out of the company by transferring the steam-power property to the company, and its reconveyance, and $1,500 out of the conveyance and purchase of the dock property, in addition to the partition costs and expenses. He concedes that he sold the three parcels of property to the company for $13,000; that he received of this amount $2,000 in cash, and the further sum of $3,862.50 as proceeds of the sale of the dock property; that he allowed the company $5,000 for the steam-power property, when it was reconveyed to him, and $2,137.50 for the creek property. The company paid to Lorman in this transaction $2,000 in cash; it paid in the partition proceeding $400, besides the costs and expenses of that proceeding; and it held the title to one parcel from May, 1883, to March, 1884, and to the other from May, 1883, to early in 1887.

He admits the rent charges, but claims that his share of these parcels of property was of greater value than Miner's. The steam-power property had been rented to the company for $1,000 per annum. It was partitioned, and the court assigned to the company the west half, subject to the pay-

ment of $400 to Miner. In the adjustment of the rent, in 1886, the arbitrator selected by Miner fixed the rental value of Miner's share at $800; but Lorman insisted that it was not worth that amount, and went into court, and the court decided that the rental value was $500. So that in proceedings to which Lorman was practically a party the court found not only the rental value, but the relative value of both parcels, and found Lorman's share to be worth exactly $400 more than Miner's; yet Lorman paid himself $4,700 for five years' rental of his share, and Miner received $2,500, a difference of $2,200 in favor of Lorman. Respecting the creek property, in 1885 Miner offered to take $300 per year for his half, and the arbitrator selected by Miner, and the court, fixed the value of Miner's undivided half at $200 per annum. Lorman then insisted that it was not worth but $125. The company had but just reconveyed this half interest to Lorman, and he received $250 per annum for 1887 and 1888, and $500 per year for the next two years. Can there be any possible ground for claiming that his undivided half was worth more than Miner's?

He admits the purchase of the Beniteau property for $3,500, and that for five years thereafter he paid himself in rentals therefor, $4,650.

No one of Lorman's associates on the board of directors for the six years preceding the filing of this bill is sworn, or offers any testimony to sustain any act of said board during that period. Lorman only appears. Gray, Muir, Linn, and Prentis severally answer, but each "neither admits nor denies" the charge made in the bill, and neither alleges even good faith.

Under all the rules governing the relation of directors of a corporation to that corporation and its stockholders, and their conduct pending that relation, the simple statement of the facts of this case ought to decide it. As is said by Mr. Justice Miller, in *Oil Co. v. Marbury*, 91 U. S. 587:

"That a director of a joint-stock corporation occupies one of those fiduciary relations where his dealings with the subject-matter of his trust or agency, and with the beneficiary or party whose interest is confided to his care, is viewed with jealousy by the courts, and may be set aside on slight grounds, is a doctrine founded on the soundest morality, and which has received the clearest recognition in this court and in others."

The authorities upon the question of the validity of contracts made by directors with the corporation are by no means harmonious. It is laid down in many of the text-books that such contracts are voidable at the instance of the corporation. 1 Beach. Corp. §§ 241, 242; Mor. Corp. §§ 243–245; Tayl. Corp. §§ 629, 630; 2 Field, Briefs, § 193. Again, it has been held that a director may deal with the company in like manner as with an individual, if he deal honorably, and without endeavoring to influence or control it. 16 Amer. Law Rev. 917; *Harts v. Brown,* 77 Ill. 226; *Rolling Stock Co. v. Railroad Co.,* 34 Ohio St. 450; *Mayor v. Inman,* 57 Ga. 370.

Our own Court, in *People v. Township Board,* 11 Mich. 222, and in *Flint & P. M. Ry. Co. v. Dewey,* 14 Id. 477, have held that such contracts were not only voidable, but absolutely void. In *People v. Township Board,* MANNING, J., says:

"Actual injury is not the principle the law proceeds on in holding such transactions void. Fidelity in the agent is what is aimed at, and, as a means of securing it, the law will not permit the agent to place himself in a situation in which he may be tempted by his own private interest to disregard that of his principal."

CHRISTIANCY, J., in the same case, says:

"As individuals, in taking the contract, they must naturally (and while human nature remains unchanged, we may almost say, necessarily) seek to adopt the plan and to make the terms most conducive to their own interests. The public were entitled to their best judgment, unbiased by their private interests, and by accepting the office they

became bound to exercise such judgment, and to use their best exertions for the public good, regardless of their own. They had no right, while they continued in office, to place themselves in a position where their own interests would be hostile to those of the public.   *   *   *   And though these contractors may, as members of the board, have acted honestly, and solely with reference to the public interest, yet, if they have acted otherwise, they occupy a position which puts it in their power to conceal the evidence of the facts, and to defy detection.   If, therefore, such contracts were to be held valid until shown to be fraudulent or corrupt, the result, as a general rule, would be that they must be enforced in spite of fraud or corruption." ·

CAMPBELL, J., dissenting, says:

"It is a well-settled principle that the same person cannot be vendor and purchaser, because his contract lacks the necessary element of two parties; neither can a trustee become interested to the detriment of his *cestui que trust,* or an agent to the detriment of his principal.   Even these contracts, however, are not universally void.   They are usually voidable at the option of the party defrauded or affected, but they are not absolutely void, except where, by reason of the identity of the vendor and vendee, a contract is, in the eye of the law, impossible.   *   *   *   The only exception seems to be the one already referred to, where the corporation cannot act at all without the action of some particular person, who is thereby disqualified from dealing with himself, and who, of course, cannot contract with himself. 1 Kyd, Corp, 180, 181; Ang. & A. Corp. § 233. In other cases, and where the contract may be made on behalf of the corporation without the assistance of a particular member or officer, a contract with him is as valid as if he were a stranger."

The present case is clearly within the exception referred to by CAMPBELL, J.   Defendant Lorman must be held to have made these contracts with himself.   He directed, influenced, and controlled the board.   They had no personal interest in the affairs of the company, and exercised, not their own judgment and discretion, but Lorman's will.   All the authorities agree that it is essential that the majority of the quorum of a board of directors shall be disinterested

in respect to the matters voted upon. 1 Beach, Corp. §
276; *Smith v. Association*, 78 Cal. 289 (20 Pac. Rep. 677).

Where a town board of three are authorized to make a
grant to a railroad, and two of them, one being director of
the railroad, make the grant, the court will set it aside.
*San Diego v. Railroad Co.*, 44 Cal. 106; *Bill v. Telegraph
Co.*, 16 Fed. Rep. 14.

A salary voted to the president by a quorum of three
directors, two being absent, and the president being one of
the three, is not enforceable.    *Copeland v. Manufacturing
Co.*, 47 Hun, 235.

Where the chief stockholder, who is president, induces
the directors, his dummies, to vote a large salary to him,
the corporation may defeat the officer's action at law to
recover it.   *Davis v. Railroad Co.*, 22 Fed. Rep. 883.

Where the majority of stock of a corporation was held
by one family, who voted away the corporate profits for
salaries, the minority may call upon a court of equity to
remedy the fraud.   *Sellers v. Iron Co.*, 13 Fed. Rep. 20.

A stockholder may compel the contractors to disgorge,
when they obtain a contract through their associates or
hirelings being made directors.    *Currier v. Railroad Co.*,
35 Hun, 355.

Where two contractors cause a railroad corporation to be
formed, in which one contractor becomes a director, and the
other directors are clerks of the second contractor, and the
construction contract is made with these two, by means of
dummy intermediaries, at an improvident price, one of the
contractors cannot compel the other to divide the profits.
*Jackson v. McLean*, 36 Fed. Rep. 213.

The contracts fixing salaries and rentals must therefore be
held not only voidable, but absolutely void.   In any case
the burden is upon the director to show fairness, reasona-
bleness, and good faith, and upon this record these trans-

actions must not only be held to be constructively fraudulent, but fraudulent in fact.

There might be some force in the contention that complainant is chargeable with laches, if he had not commenced the former suit, and the act complained of were a single one committed in 1882.. Here the same course of conduct has continued up to the very commencement of this proceeding, and been persisted in, notwithstanding its pendency. There is no room here for any claim that the corporation has acquiesced in or ratified this conduct. A ratification, by Lorman and his dummies, of his own act, could not purge it of its fraudulent character.

The only question of difficulty in the case is as to the remedy. There is no doubt of the power of a court of equity, in case of fraud, abuse of trust, or misappropriation of corporation funds, at the instance of a single stockholder, to grant relief, and compel a restitution; and where the holders of the majority of the stock control the directorate, and are themselves the wrong-doers, without any showing that the directors have been requested, or the corporation has refused, to act. *Dodge v. Woolsey*, 18 How. 331; *Pond v. Railroad Co.*, 12 Blatchf. 280; *Brewer v. Boston Theatre*, 104 Mass. 378; *Gregory v. Patchett*, 33 Beav. 595; *Peabody v. Flint*, 6 Allen, 52; *March v. Railroad Co.*, 40 N. H. 567; *Mason v. Harris*, 11 Ch. Div. 97; *Atwood v. Merryweather*, L. R. 5 Eq. 464; *Ervin v. Railway Co.*, 27 Fed. Rep. 625; *Allen v. Curtis*, 26 Conn. 456; *Hersey v. Veazie*, 24 Me. 9.

. The general rule undoubtedly is that courts of equity have no power to wind up a corporation, in the absence of statutory authority. This rule is, however, subject to qualifications. It has been held that, when it turns out that the purposes for which a corporation was formed cannot be attained, it is the duty of the company to wind up its

affairs; that the ultimate object of every ordinary trading corporation is the pecuniary gain of its stockholders; that it is for this purpose, and no other, that the capital has been advanced; and if circumstances have rendered it impossible to continue to carry out the purpose for which it was formed with profit to its stockholders, it is the duty of its managing agents to wind up its affairs. To continue the business of the company under such circumstances would involve both an unauthorized exercise of the corporate franchises and a breach of the charter contract. Mor. Corp. §§ 217, 407. The rule applicable in cases of a copartnership has been held to apply in case of a corporation or joint-stock company. *In re Suburban Hotel Co.*, L. R. 2 Ch. App. 737. In that case Lord Cairns says:

"If it were shown to the court that the whole substratum of the partnership, the whole of the business which the company was incorporated to carry on, has become impossible, I apprehend the court might, either under the act of parliament or on general principles, order the company to be wound up. But what I am prepared to hold is this: That this court, and the winding-up process of the court, cannot be used as the means of evoking a judicial decision as to the probable success or non-success of a company as a commercial speculation."

In the present case, we have a corporation that for seven years has not paid a dividend. Complainant has had invested and tied up nearly $18,000. The only reason why it has failed to pay dividends, for part of the time at least, is because defendant Lorman, owning a majority of the stock, has controlled the corporation in his own interest and profit. Is a court of equity powerless to give an adequate remedy because the failure to pay dividends is not attributable to natural causes, but by reason of gross frauds perpetrated by the management? Would the court hesitate an instant in case this were a copartnership? In *Ervin v. Railway Co.*, 27 Fed. Rep. 625. 630, Wallace, J., says:

93 MICH.—8.

"Plainly, the defendants have assumed to exercise a power belonging to the majority, in order to secure personal profit for themselves, without regard to the interests of the minority. They repudiate the suggestion of fraud, and plant themselves upon their right as a majority to control the corporate interests according to their discretion. They err if they suppose that a court of equity will tolerate a discretion which does not consult the interests of the minority. It cannot be denied that minority stockholders are bound hand and foot to the majority in all matters of legitimate administration of the corporate affairs; and the courts are powerless to redress many forms of oppression, practiced upon the minority under a guise of legal sanction, which fall short of actual fraud. This is a consequence of the implied contract of association, by which it is agreed in advance that a majority shall bind the whole body as to all transactions within the scope of the corporate powers. But it is also of the essence of the contract that the corporate powers shall only be exercised to accomplish the objects for which they were called into existence, and that the majority shall not control those powers to pervert or destroy the original purposes of the corporators;" citing *Livingston v. Lynch,* 4 Johns. Ch. 573; *Hutton v. Hotel Co.,* 2 Drew. & S. 514; *Brewer v. Boston Theatre,* 104 Mass. 378; *Kean v. Johnson,* 9 N. J. Eq. 401; *Rollins v. Clay,* 33 Me. 132; *Clinch v. Financial Corp.,* L. R. 4 Ch. App. 117; *Clearwater v. Meredith,* 1 Wall. 25.

"When a number of stockholders combine to constitute themselves a majority in order to control the corporation as they see fit, they become, for all practical purposes, the corporation itself, and assume the trust relation occupied by the corporation towards its stockholders. Although stockholders are not partners, nor strictly tenants in common, they are the beneficial joint owners of the corporate property, having an interest and power of legal control in exact proportion to their respective amounts of stock. The corporation itself holds its property as a trust fund for the stockholders, who have a joint interest in all its property and effects, and the relation between it and its several members is, for all practical purposes, that of trustee and *cestui que trust. Peabody v. Flint,* 6 Allen, 52, 56; *Hardy v. Land, etc., Co.,* L. R. 7 Ch. App. 427; *Stevens v. Railroad Co.,* 29 Vt. 550. When several persons have a common interest in property, equity will not allow one to appro-

priate it exclusively to himself, or to impair its value to the others. Community of interest involves mutual obligation. Persons occupying this relation towards each other are under an obligation to make the property or fund productive of the most that can be obtained from it for all who are interested in it; and those who seek to make a profit out of it, at the expense of those whose rights in it are the same as their own, are unfaithful to the relation they have assumed, and are guilty, at least, of constructive fraud. *Jackson v. Ludeling*, 21 Wall. 616, 622; Story, Eq. § 323."

In *Dodge v. Woolsey*, 18 How. 331, Wayne, J., says:

"It is now no longer doubted, either in England or the United States, that courts of equity in both have a jurisdiction over corporations, at the instance of one or more of their members, to apply preventive remedies by injunction, to restrain those who administer them from doing acts which would amount to a violation of charters, or to prevent any misapplication of their capital or profits, which might result in lessening the dividends of stockholders or the value of their shares, as either may be protected by the franchises of a corporation, if the acts intended to be done create what is in the law denominated a breach of trust. And the jurisdiction extends to inquiry into, and to enjoin, as the case may require that to be done, any proceedings by individuals, in whatever character they may profess to act, if the subject of complaint is an imputed violation of a corporate franchise, or the denial of a right growing out of it, for which there is not an adequate remedy at law. * * * It is not only illegal for a corporation to apply its capital to objects not contemplated by its charter, but also to apply its profits. * * * Thinking, as we do, that the action of the board of directors was not an error of judgment merely, but a breach of duty, it is our opinion that they were properly made parties to the bill, and that the jurisdiction of a court of equity reaches such a case, to give such a remedy as its circumstances may require."

In *Wallworth v. Holt*, 4 Mylne & C. 635, Lord Cottenham says:

"I think it is the duty of this court to adapt its practice and course of proceeding to the existing state of society, and not, by too strict an adherence to rules and forms

established under different circumstances, to decline to administer justice, and to enforce rights for which there is no other remedy."

Sir James Wigram, in *Foss v. Harbottle*, 2 Hare, 491, says:

"Corporations of this kind are in truth little more than private partnerships; and in cases which may be easily suggested it would be too much to hold that a society of private persons associated together in undertakings which, though certainly beneficial to the public, are nevertheless matters of private property, are to be deprived of their civil rights *inter se*, because, in order to make their common objects more attainable, the crown or legislature have conferred upon them the benefit of a corporate character."

In *Bacon v. Robertson*, 18 How. 480, which was a proceeding to compel the trustees to distribute among the stockholders the effects of a corporation whose charter had been forfeited, there is an able discussion by Campbell, J., of the powers of courts of equity relating to corporations. Campbell, J., referring to the cases just cited, says:

"These just views which have afforded to wise chancellors a sufficient motive to enlarge the scope and relax the vigor of the rules of chancery proceedings, so as to bring the civil rights of individuals, in whatever form they may exist, or however complicated or ramified, under the protection of legitimate judicial administration, have been adopted in the United States, not simply for the improvement of methods of proceeding, but also for the adjustment of rights and the assertion of responsibilities among the members of such associations."

The present case furnishes an instance of gross abuse of trust. Must the *cestui que trust* be committed to the domination of a trustee who has for seven years continued to violate the trust? The law requires of the majority the utmost good faith in the control and management of the corporation as to the minority. It is of the essence of this trust that it shall be so managed as to produce for each stockholder the best possible return for his investment. The trustee has so far absorbed all returns. What is the out-

look for the future? This Court, in view of the past, can give no assurances. It can make no order that can prevent some other method of bleeding this corporation, if it is allowed to continue. If Lorman be removed, who shall take his place? He has the absolute power to determine. Once deposed he may elect a dummy to fill his place. There are practically but three persons concerned, Miner, Lorman, and Lorissa Carpenter, and she has for seven years, in fraud of complainant's rights, been paid a dividend to secure her acquiescence. Who has any right to complain if ample and complete justice is awarded to Miner? Who should be permitted to stand between him and an adequate remedy? This corporation has utterly failed of its purpose, not because of matters beyond its control, but because of fraudulent mismanagement and misappropriation of its funds. Complainant has a right to insist that it shall not continue as a cloak for a fraud upon him, and shall not longer retain his capital to be used for the sole advantage of the owner of the majority of the stock, and a court of equity will not so far tolerate such a manifest violation of the rules of natural justice as to deny him the relief to which his situation entitles him.

I think a court of equity, under the circumstances of this case, in the exercise of its general equity jurisdiction, has the power to grant to this complainant ample relief, even to the dissolution of the trust relations. Complainant is therefore entitled to the relief prayed. A receiver will be appointed, and the affairs of this corporation wound up. Defendant Lorman must account, and pay over all moneys illegally received by him, paid to him, or paid out by him from the funds of the corporation:

1. For all moneys advanced to Lorissa Carpenter.
2. For all moneys paid to or received by him as salary,

since and including the year 1882, in excess of the sum of $2,400 per annum.

3. For the amount paid by said corporation to him, the said Lorman, on account of the three parcels of property, whether interest or principal, and for all moneys paid out by said corporation by reason of said purchase, including the said sum of $400 paid by said corporation to equalize the values of the parcels of said steam-power property on said partition, and including all expenses and costs to said corporation by reason of said partition, as well as all interest paid by said corporation upon the two mortgages, subject to which said corporation purchased the dock property and the creek property; provided, however, that said Lorman shall be allowed rents for each of said parcels for any period for which rents have not been paid by reason of such purchase, at the rate of $150 per annum for the creek property until January 1, 1886, and thereafter at the rate of $200 per year; at the rate of $500 per annum for the steam-power property; and for his share at the rate fixed by the lease between the company and Lorman and Miner for the dock property.

4. For all rents wich have been paid since 1886 by said company to said Lorman in excess of the following: For the creek property $200 per annum, for the steam-power property $550 per annum, and for the dock property such sum as may be fixed by the circuit court for the county of Wayne, having reference to that paid prior to that time for the same property.

5. For all rents paid or allowed to said Lorman for the Beniteau property in excess of an annual rental to be fixed by the said Wayne circuit court.

6. For any sums which shall have been paid by the said corporation as costs, fees, or expenses of this proceeding, or which may be paid by said corporation, or for which it may be held or adjudged liable.

The decree below is therefore reversed, and a decree will be entered here in accordance with the foregoing, and the cause remanded for further proceedings in accordance herewith. Complainant will be entitled to recover the costs of both courts against defendant Lorman.

The other Justices concurred.