LUCAS *v.* FRIANT.

1. CORPORATIONS—MORTGAGES—DIRECTORS—ESTOPPEL.

A stockholder and director of a corporation who has voted at a regular meeting of the directors, at which a majority were present, in favor of a resolution to mortgage the property of the corporation, cannot complain that such resolution was not regularly adopted because one of the other directors, who voted in favor of the resolution, was the indorser of paper secured by the mortgage, and two other directors so voting had indemnified him in writing as such indorser.

2. SAME—RESOLUTIONS—WAIVER.

The officers of a corporation which had become largely indebted were authorized by the directors to execute to the creditors, upon demand, a chattel mortgage covering the corporate property. At the same time a committee was appointed to devise a scheme for reorganization, and a plan was subsequently proposed, and adopted by resolution, which involved an increase of the capital stock. The attempt at reorganizing the corporation was unsuccessful, and a mortgage was given as security for the payment of its debts. *Held,* that the resolution to mortgage was not waived by the subsequent resolution to increase the capital stock.

3. SAME—FORECLOSURE SALE—PURCHASE BY DIRECTOR.

A stockholder and director in a corporation, who loans it money, and takes as security a chattel mortgage covering its effects, may, as against other stockholders and directors, become a purchaser at the sale on foreclosure of the mortgage.

Appeal from Kent; Grove, J.   Submitted November 12, 1896.   Decided January 5, 1897.

Bill by Thomas J. Lucas and Mary A. Lucas against Thomas Friant, McGeorge Bundy, the Grand Rapids Vapor-Stove Company, and others, to set aside a mortgage and sale of corporate property, and for an accounting. From a decree dismissing the bill, complainants appeal. Affirmed.

*Albert Crane,* for complainants.

*P. H. Travis* (*McGeorge Bundy, in pro. per.*), for defendants.

LONG, C. J.   In October, 1892, Charles H. Child, of Cleveland, Ohio, claiming to be the owner of valuable patents for the construction of vapor stoves, came to Grand Rapids, and interested with himself T. J. Lucas, one of the complainants.   Together they interested other parties in the formation of what was called the Grand Rapids Vapor-Stove Company, Lucas claiming that he had investigated the proposed business, and representing it as very profitable.   A prospectus of the business was shown, exhibiting large profits.   The defendants, together with Lucas and Child and some other parties, became the stockholders in the company.   Child transferred his patents to the company, and received therefor $5,000 of the capital stock.   The company was capitalized at $25,000, but at that time only $18,500 was paid in by the stockholders.   None of the stockholders had ever had any experience in the business, and they claim to have invested in it on the representations of Child and Lucas. Lucas was made manager of the company at a salary of $100 per month, because he was one of the promoters, and claimed to have posted himself in the business.   He and Child proceeded to purchase machinery, tools, and stock suitable for manufacturing stoves under the Child patents, and Mr. Child was to get up the patterns for the stoves. The business was commenced in a rented building.   It was represented to the stockholders that the business could be conducted on the capital paid in, and that several

thousand stoves could be manufactured the first year. The stoves which were to be made the first year were contracted to Leonard & Sons, of Grand Rapids. A large quantity were manufactured and delivered to this firm, and by it placed on the market; but the stoves failed to work, and were returned by the public to Leonard & Sons, and by it turned back to the company. Stoves commenced to come back early in the season, and continued to come back during the whole year. A large quantity of materials had been bought for the construction of the stoves, similar to those put. out, which became practically worthless, so that the main business of the company after that time consisted in attempting to fix over the old stoves, and to devise some new stoves which would prove marketable. The money which had been paid in had been expended, and the company commenced borrowing at the bank to continue the business.

In June, 1893, a meeting was called to arrange for the indebtedness. $7,500 had been borrowed at the National City Bank of Grand Rapids on Mr. Friant's indorsement. At that meeting it was proposed to provide funds by which each stockholder should voluntarily advance to the company an amount equal to 10 or 20 per cent. of his stock in the company. In this way $1,295 was advanced by different stockholders. The complainant Thomas J. Lucas, though a stockholder, made no advances, and no money was paid in by Mr. Child. These moneys did not meet the obligations of the company, and on September 4, 1893, a regular meeting of the directors was held at the company's office, at which were present Friant, Raniville, Lucas, Child, and Bundy,—a majority of the directors. A resolution was unanimously passed by them as follows:

"The present affairs of the company being under consideration, and its obligations maturing, on motion of Mr. Bundy, seconded by Mr. Raniville, it was unanimously resolved as follows: That the Grand Rapids Vapor-Stove Company, by its president and secretary, execute to the holders of the company's paper or the in-

dorser thereon a chattel mortgage on all the property of the company, including its patents, to secure such paper and such indorser; that such mortgage be given on the demand of either the holders of said paper or such indorser."

It was further resolved as follows:

"On motion of Mr. Bundy, seconded by Mr. Lucas, it was resolved that a committee of three of the stockholders be appointed by the chair to formulate a plan for the future action of the company for submission to the stockholders."

In October following, the committee made a report to the company, proposing a scheme for the reorganization of the company, by increasing the capital stock from $25,000 to $50,000, and making the new stock preferred stock. This resolution and preamble had been prepared in advance, and stated the purpose of the proposed reorganization as follows:

"It is understood that said company is now insolvent, and that this agreement is made to secure the continued operation of the company's business, and the making valuable all stock thereof, if possible; that some of the present stockholders are willing to subscribe and pay for such new stock on the foregoing conditions, and some of such stockholders are not willing or able to so subscribe and pay for such new stock on any conditions; and that the agreements herein contained are made to indemnify the subscribers to such new stock against losses, so far as possible, and to compensate them for the risk which they take in order to make all the stock of said company valuable, which risk is not assumed by all the stockholders of the old stock."

This resolution was written out in the record of that meeting, and signed by all of those present, including both complainants, as Mrs. Lucas at that time had become the owner of a part of the stock held by her husband, Thomas J. Lucas. An attempt was thereafter made to get all of the stockholders in the company to agree to this, as it involved the preferring of the new stock, and could be accomplished only by the consent of

all the stockholders. This was found impossible. Mrs. Child, in the meantime, had become the owner of stock held by her husband, Charles H. Child. The defendants Friant, White, and Bundy each consented to the arrangement, and subscribed for some of the new stock. The complainants consented to the arrangement, but did not subscribe for any new stock. During this time the condition of the affairs of the company's business was growing worse, and it was understood that, unless this scheme for the reorganization could be accomplished, the business could not continue. In the latter part of October, 1893, the company had no funds, except about $30 in the bank, and there was nothing with which to pay the debts, except the property of the company. The creditors urged payment of their debts or security therefor. The mortgage, which had been provided for at the directors' meeting of September previous, was then given as security for the payment of the debts. It was thereafter foreclosed, and the property bid in by Mr. Friant, who shortly afterwards conveyed equal interests in it to eight of the old stockholders, who had signed the indemnity agreement, and who joined with him in paying up the debts of the company.

The complainants set out in their bill that, even up to the 31st of October, 1893, the corporation was in good credit, owing only about $7,500, with assets and business exceeding in value $25,000; that no creditors were pressing the corporation; that the business of the company was increasing, and its affairs in every way promising; that, shortly prior to this suit, defendants Friant, White, and McCoy, with the pretense that defendant Friant must be relieved of his liability on the paper of the corporation, but in truth and fact to carry out a fraudulent scheme and plan on their part to get the title and control of the business of the corporation, and to divest the corporation and about one-third of its stockholders of all interest in such property and business, commenced to complain of the state of the company's finances, and that such com-

plaints and agitation did not come from the company's creditors; that in the latter part of October the defendants Friant, White, McCoy, and Bundy pretended to hold a meeting of the directors of such corporation; that said last-named defendants, or some of them, caused a report of said meeting to be written up, representing Thomas J. Lucas as being present and seconding a motion to mortgage the property of the corporation, but that Thomas J. Lucas was not present at such directors' meeting, if any was held in fact; that he never received notice of such directors' meeting, and that he never seconded any motion to mortgage the property of the corporation; that he had no notice or information of the scheme of defendants Friant, White, McCoy, and Bundy to mortgage the propery until he saw a notice in one of the newspapers published in the city of Grand Rapids. He therefore charges that the defendants Friant, White, and McCoy willfully and fraudulently conspired to divest the corporation of its property and business, and to obtain title to the same for their own purposes, and to continue and carry on such business in their own names; that defendant Bundy has been under their control, and has been influenced by them, and they have shared with him the property and profits of the scheme, and by acquiescence, and by participating in the benefit of said fraudulent scheme, said Bundy has ratified the fraudulent acts of the other defendants; that by such fraudulent scheme all the defendants determined to put a chattel mortgage upon the property and effects of the corporation, and that they did put a chattel mortgage thereon, reciting that the corporation was indebted to certain of its laborers and employés to the sum of $600, more or less, to the bank $6,500, and to the firm of Leonard & Sons the sum of $400, and appointed in said mortgage Charles Chandler as trustee; that this mortgage was filed in the city clerk's office, and thereafter foreclosed, and the property bid in by Friant, for the sum of $1,600, for the benefit of himself and defendants White, McCoy, and Bundy, and that they afterwards

started up the business of manufacturing vapor stoves with the same property; that the mortgage given as aforesaid was fraudulent and void as against complainants and other stockholders similarly situated. The prayer of the bill is that the resolution of the directors authorizing the giving of the mortgage be set aside and held void; that the chattel mortgage be set aside and decreed void, as well as the sale thereunder; and that the defendants Friant, White, McCoy, and Bundy account for the value of the property, together with all profits and income derived therefrom, and all additions thereto. This bill was sworn to by complainant Thomas J. Lucas.

The defendants answered the bill, denying all the material allegations therein, but admitting the giving of the mortgage, and asserting that Thomas J. Lucas was present at the time the resolution was passed authorizing it; that it was given to secure the indebtedness of the company, and the foreclosure was had for the purpose of paying such indebtedness; and that the sale was in all respects fair. The proofs were taken in open court, and the court made a decree reciting that—

" It appearing that the material allegations in the bill of complaint in said cause are not established by the evidence, and that the fraud and conspiracy alleged in said bill did not exist, but have been expressly disproved; and it further appearing that the mortgage therein mentioned was duly and legally authorized by said corporation, and that the giving and foreclosure thereof were, in all respects, regular and fair; and it further appearing that, at the time said mortgage was given and foreclosed, said Grand Rapids Vapor-Stove Company was insolvent, and that the value of its property and assets was less than the amount of its indebtedness and liabilities,—it is therefore ordered, adjudged, and decreed that the bill of complaint in said cause be dismissed, and that the defendants Thomas Friant, T. Stewart White, Daniel McCoy, and McGeorge Bundy do recover from said complainants their costs of this suit, to be taxed, and that they have execution therefor."

The charge of conspiracy in the bill is abandoned by

complainants' counsel, and in his brief he makes no claim that complainant Lucas was not present at the meeting when the mortgage was voted, or that the record of that meeting was a false record, and spread upon the books without the knowledge and consent of Lucas. We feel that these questions should not pass unnoticed here. The evidence is overwhelming to our minds that there was no ground for the charge of conspiracy against these defendants, and that, while complainant Lucas charges in his bill that he was not present at the time the resolution was passed authorizing the giving of the mortgage, he was present at that meeting, and took part in the proceedings thereof. We are also satisfied that the liabilities of the company exceeded its assets.

Counsel for complainants contends in this court:

1. That complainants' error in regard to the manufacture of stoves, and in respect to the money required to carry on the business, is a defense without merit.

2. That the defendants held the relation of trustees to the stockholders of the corporation.

3. That the resolution to mortgage was not legally adopted.

4. That the resolution to mortgage was waived by the resolution and agreement to increase the stock of the corporation.

5. That the trustees could not purchase the property which they held in trust for others at public auction.

6. That the directors could not sell the company property, even though the corporation was insolvent, against the dissent of any stockholder.

7. That the complainants have not confirmed the foreclosure sale by not opposing it.

8. That the directors of a corporation actually insolvent cannot bring about a sale of its property to themselves for the purpose that they may continue the business of the corporation.

9. That the complainants are entitled to their proportionate value of the property of the corporation, with interest from the date of its conversion.

We do not understand that the defendants attempted to

make a defense to the complainants' bill on the ground that the complainant Lucas erred in regard to the manufacture of stoves, or in respect to the money required to carry on the business. The defendants were charged by the bill of complaint with having committed a fraud upon the complainants in the sale of the corporate property, and in the manner of bringing about the sale, while the company had sufficient assets to meet its liabilities. In answer to this claim, the defendants sought to establish, and did establish by the record, the facts that it was through the representations of Lucas and Child that they were induced to go into the enterprise, and that Lucas, being the manager of the company, became greatly indebted, and for the purpose of securing these debts the mortgage was given, as well as the fact that the company was insolvent at the time the resolution was passed to place the mortgage upon the property.

It is not contended but that the directors of the corporation were trustees of the stockholders and the creditors.

The point, made by counsel for complainants, that the resolution to mortgage was not regularly adopted, is based upon the fact that Friant was a director of the company and its president, that he was also the indorser of its paper, and that Bundy and McCoy had in writing indemnified him as indorser, and that for these reasons neither Friant nor McCoy nor Bundy was competent to vote at the directors' meeting when the resolution to mortgage was adopted. Counsel cites, in support of this proposition, *Butts* v. *Wood*, 37 N. Y. 317; *Miner* v. *Ice Co.*, 93 Mich. 97. We think the case does not fall within the principle stated in those cases. In the last one, it appeared that Lorman was a director and president of the company, had a majority of the stock, and absolutely controlled the corporation in his own interest, without dissent from any of the directors or stockholders, except Miner, who filed the bill in that case. The other directors were simply figureheads on the board, and controlled

absolutely by Lorman. Whatever he desired to have voted by the directors was complied with by all except Miner. Lorman, in fact, by his control of the company, voted himself a salary of $4,000 per year, and kept no account of the company's business, covered up the proceeds of the sale of ice, and in other ways hindered and prevented Miner from receiving any part of the profits. The bill was filed for an accounting, and the charge of fraud was made and shown against Lorman in the conduct of the business. In the present case no charges of fraud have been sustained. The corporation was insolvent, and the mortgage was given to secure a *bona fide* indebtedness. Another fact, also, appears in this case, making it very different from the cases cited by counsel. Complainant T. J. Lucas was present at the time the resolution was adopted to mortgage the property, took part in the proceedings of the board, and voted in favor of the passage of the resolution. We think, under such circumstances, that the complainants are not in a position to complain of the adoption of that resolution, though Friant and the other parties voted in favor of it. If the doctrine which is contended for by counsel for complainants could be applied to this case, then it would have been impossible for the corporation, by any action which it might take, to secure either the bank debt or the labor debts, because all the stockholders were liable for the labor debts, and all of them had signed the agreement to indemnify Mr. Friant, to the amount of the stock held by each of them, on his indorsement at the bank.

The proposition that the resolution to mortgage was waived by the resolution to increase the capital stock of the corporation has no force whatever. These two resolutions were passed, one at the September meeting, and the other in October following, and it is apparent that the resolution to appoint a committee to formulate a plan for the future action of the company was an effort in the direction of raising funds to continue the business, and that, failing in that, the mortgage was to be placed upon the property.

This is shown by the testimony in the case, and by the resolutions themselves.

The proposition that Mr. Friant could not become a purchaser at the sale cannot be sustained. That question was settled in *Bank of Montreal* v. *J. E. Potts Salt & Lumber Co.*, 90 Mich. 345. See, also, *Twin-Lick Oil Co.* v. *Marbury*, 91 U. S. 587; *Saltmarsh* v. *Spaulding*, 147 Mass. 224; *Harts* v. *Brown*, 77 Ill. 226.

The claim that the directors could not sell the corporate property, even though the company was insolvent, against the dissent of any stockholder, is not involved here. The directors authorized the mortgage to be made by and with the consent of the complainants, and certainly the trustee in the mortgage had the right to sell the property for the payment of the corporate debts.

We think the other propositions need not be considered, as the sale seems to have been an open and fair one.

The decree of the court below must be affirmed, with costs in favor of the defendants.

GRANT, HOOKER, and MOORE, JJ., concurred. MONTGOMERY, J., did not sit.