GLEN ALLEN MINING CO. v. PARK GALENA MINING CO. et al.

No. 4920.   Decided March 6, 1931.   (296 P. 231.)

*De Vine, Howell, Stine & Gwilliam* and *A. W. Agee,* all of Ogden, for appellant.

*M. E. Wilson, E. A. Walton,* and *J. Louis Brown,* all of Salt Lake City, for respondents.

BATES, District Judge.

The plaintiff and appellant brought this action to recover from the defendants certain mining property; to have the defendant Anderson and the Park Galena Mining Company decreed to hold said property in trust; and for an accounting by the defendant for ores extracted from the mining properties and moneys received therefrom.

One of the defenses pleaded is that the cause of action set out by plaintiff has been adjudicated. Upon this question the defendants' plea is that on or about the —— day

of August, 1926, in a foreclosure action brought by Francisco Rospigliosi against the Glen Allen Mining Company, judgment was rendered against the Glen Allen Mining Company denying its motion and petition to set aside the sheriff's sale of the property referred to in this action to William Anderson; that in said action it was adjudicated and determined that the sales to William Anderson were good and valid; that in said petition to set aside the sheriff's sale, and in the evidence offered in support thereof, all the things alleged in the plaintiff's complaint in this action were put in issue, fully tried, heard, and determined against the Glen Allen Mining Company; that the defendants in this case are in direct privity with Rospigliosi, plaintiff in that action, as his successors in interest, and that said judgment is in full force; that it has not been modified or reversed; and that the time for appeal has passed.

It is the contention of the respondents in this case that the judgment denying the petition to vacate the sheriff's sale is final, and that it is a complete adjudication of all the questions involved in this case, and therefore binding upon the parties. In their brief they state their position upon this question as follows:

"We contend of course that a judgment purporting to be on the merits must be so regarded as against a collateral attack. Especially do we contend that a judgment to be with prejudice ought never to be considered to be without prejudice merely because the court who rendered it may have had an erroneous opinion that it should be so.

"It is not open for the appellant here to say that the judgment we put in evidence is erroneous. 2 Freeman Judgments Section 709."

"When the second action between the same parties is upon a different claim or demand, or cause of action, it is well settled that the judgment in the first suit operates as an estoppel only as to the point or question actually litigated or determined, and not as to other matters which might have been litigated and determined. This rule holds true whether the judgment is used in pleading as a technical estoppel, or is relied on by way of evidence as conclusive per se. In all cases it should appear that the first judgment determined the actual question at issue between the parties and that the precise

question was raised and determined in the former suit." 15 R. C. L. 973.

"A judgment concludes the parties only as to the facts actually decided, or which were necessarily involved in it and without the existence of which such judgment could not have been rendered, and is not conclusive as to matters not litigated or material to recovery in the former suit." 15 R. C. L. 977.

The judgment rendered determined only that the motion of the Glen Allen Mining Company to set aside the sheriff's sale was denied. The question as to whether or not Anderson held title in trust for the Glen Allen Mining Company was not actually decided, and the court did not intend to determine that question. Neither was this question so involved in the judgment actually rendered that the judgment could not have been rendered without its determination. It is difficult to understand from the record made in this case how the question whether or not Anderson held the property in trust for the plaintiff herein could have arisen upon the hearing of the petition to set aside the sale. The foreclosure sale was held on January 6, 1926. Thereafter the petition to set aside the sale was filed, and hearing had thereon, June 29, 1926, within the redemption period and before the sheriff's deed had issued. Under the terms of the contract with Rospigliosi, all Anderson received for his payment was an option to purchase at any time up to and including ten days after the sheriff's deed on foreclosure was available to the successful bidder.

Although Anderson agreed to and did bid at the sheriff's sale the amount due on the Rospigliosi and Helena L. K. Goddard notes, with costs and attorney fees, yet he was not bound to pay the purchase price until the sheriff's deed was available to him. The agreement also provided that, if and when said time arrives, it is evident to said trustees that William Anderson cannot obtain the sheriff's deed, then the $10,000 payment shall be returned to Anderson. His entire obligation at the time of the hearing was conditioned upon his getting title. The only condition upon which he

was required to or would make payment of the balance of the purchase price was that he received the deed. If the court had attempted in that proceeding to burden the sherrif's deed when issued, with a trust, Rospigliosi would have been prevented from completing his end of the contract; Anderson could have refused to make payment of the remainder $24,500; and no doubt would have demanded and received back his initial payment.

When the sheriff's deed was issued, a new condition arose. The cause of action upon which this action is based and evidence material to these issues came into existence after the motion to set aside the foreclosure sale was filed and hearing had thereon.

The respondent relies upon the rule of law that judgments are binding on their parties and on their privies and successors in interest. But the rule cannot reach the facts in this case. The term "privity" is defined as a mutual or successive relationship to the same right or property. As applied to judgments or decrees of courts, the word means one whose interest has been legally represented at the time. The ground on which persons standing in privity to the litigating party are bound by the proceeding to which he is a party is that they are identical with him in interest. See 6 Words and Phrases, First Series, page 5608, and cases there cited.

When the motion to set aside the sale was presented to the court, the defendant Anderson had an option to purchase the mortgaged property. His rights were no greater than Rospigliosi's. If the motion to set aside the sale had been granted, Anderson would have been bound by such an order, because his rights were dependent upon the success of the person from whom he obtained the option during the progress of the litigation.

But a different situation is presented by the facts in this case. Here an attempt is made to bind Anderson upon a question of trust relationship between him and the defen-

dant in the foreclosure proceeding on the theory of privity of interest between him and the plaintiff Rospigliosi. Upon this question there is neither mutual, successive, nor any relationship between Rospigliosi and Anderson. Anderson's relations to the Glen Allen Mining Company were in no way dependent upon, or connected with, Rospigliosi. He had not the slightest interest in the dispute between Anderson and the Glen Allen Mining Company. It was entirely immaterial to him whether Anderson, in purchasing the property, became the owner in his own right, or whether, when the transaction was consummated, it resulted in creating a trust in favor of the Glen Allen Mining Company. He was interested in having the foreclosure proceedings and the sale of the property thereunder completed to the end that, when the sheriff's deed was tendered, it would become the duty of Anderson to exercise his option, and in that only.

No issue was formed between Anderson and the Glen Allen Mining Company when the motion was heard, and Anderson was not served with notice that such question would be litigated. The trial court recognized these conditions when it determined the motion to vacate and set aside the sale, refused to determine the question of trust relationship, and limited his judgment to a denial of the motion to vacate and set aside the sale. Under these conditions, Anderson ought not be bound by any judgment upon that question, and it follows as a matter of course that the Glen Allen Mining Company could not be bound.

Another defense relied upon by the respondent is that of laches. Upon this question they allege that the property involved is undeveloped mining property of a speculative nature and subject to great fluctuation; that the defendants have expended a large amount of money in the acquisition of the property and in the development and operating of the same; that their title is good and unimpeachable; that the plaintiff has been guilty of inequitable conduct toward Anderson and Featherstone and their

predecessor Rospigliosi, and has been guilty of great and unreasonable delay in the assertion of its claims and in the prosecution of this suit.

The record clearly shows the following facts: The defendants Anderson and Featherstone, together with a board of directors elected upon the suggestion of Featherstone, were in charge of the Glen Allen Mining Company and its property until February, 1925, as the duly recognized officers of the corporation. From then on, until June 15, 1925, they asserted their right to the control and management of the property and affairs of the plaintiff corporation, and retained the office, books, and accounts of the company until June 23, 1925, although they had resigned as directors on the 15th.

A judgment in foreclosure of the Rospigliosi mortgage was entered on November 16, 1925, and the sheriff advertised the property for sale and sold it to the defendant William Anderson on January 4, 1926. When the petition for confirmation of sale was filed, the plaintiff objected, and petitioned the court to vacate and set aside the sale upon substantially the same grounds as are relied upon in this action. After hearing, the court refused to vacate the sale, and entered its judgment in the foreclosure action on October 11, 1926. That case was subsequently appealed to the Supreme Court, and the appeal dismissed. The amended complaint in this case was filed June 1, 1927.

It is thus apparent that the plaintiff has at all times been urging its rights in court in one form or another. At no time can it be said that plaintiff was by its acquiescence misleading the defendant in any way. In less than eighteen months from the time the sale was made by the sheriff, and within eight months after the petition to set aside the sale was denied by the court, this action was commenced. During that time an appeal had been taken to the Supreme Court and dismissed. Under these conditions defendants cannot complain that they have been misled to their injury by the delay of the plaintiff.

The evidence of the defendants in this case and the undisputed evidence of other witnesses establishes the following facts: The plaintiff corporation was organized in 1918. In 1925 there were more than 300 stockholders scattered through a number of the Western States. The company was the owner of the mining property involved in this litigation, and had some equitable rights in other adjoining property, which was necessary to the company for the practical operation of its mine. In 1923 the plaintiff company was owing a large sum, and had no funds with which to continue operations. In 1920 the company borrowed $30,000 from Rospigliosi and $10,000 from other parties, all of which money was secured by a mortgage upon the property involved in this action. In 1923 an action was pending for the foreclosure of this mortgage, and the company was attempting to sell its treasury stock to secure money with which to pay its debts and continue its operations.

In November, 1923, plaintiff entered into an agreement with the defendant Featherstone whereby they hoped to finance the plaintiff by the sale of stock. This agreement was modified in December of the same year. Under the terms of the modified agreement, the defendant Featherstone undertook to sell $7,500 of certificates of indebtedness of the plaintiff company during each of the months of the year 1924, and to manage the affairs of the company. The agreement also authorized Featherstone to deliver these certificates of indebtedness to creditors of the plaintiff corporation in settlement of their accounts, and provided that such issuance and acceptance should constitute a sale. For these services Featherstone was to receive 87,500 shares of the stock of plaintiff corporation, and 10 per cent commission on all cash or its equivalent paid to the company for certificates of indebtedness sold by him.

Within a very short time after the modifying agreement was executed, Mr. Featherstone reported to the directors of the plaintiff company that he would be more successful

in disposing of the certificates of indebtedness if the board of directors was changed. Under his suggestions and direction, the members of the board of directors resigned. New directors were selected by Featherstone and elected in March, 1924.

The defendant Anderson is one of the men who was named as director; he was also made president; and Featherstone was appointed general manager. The body of men so appointed will be hereafter referred to for convenience as "The Anderson Group." They were recognized and acted as the board of directors of the plaintiff company until February 27, 1925. On that day a special stockholders meeting was held and a new board of directors elected. The Anderson group and such stockholders as were interested with them remained away from the meeting, and did not recognize it as being a legal meeting. Neither did they recognize the board of directors elected on that day as having any authority to act for the plaintiff company. When the new board so elected attempted to take possession of the office, they were forcibly resisted and the police force called to assist the Anderson group in maintaining possession. On May 19th the regular stockholders' meeting was held, and the men elected on February 27th were again elected as directors of the company. They again attempted to take possession, and their possession was resisted by the Anderson group, who continued to act as directors, until June 15, 1925, when they formally resigned. On June 23d they delivered the office and books of the company to the directors who had been elected on February 27th, and again on May 19th.

Featherstone did not sell the compensation certificates as provided in the modified agreement of December, 1923, and made no effort so to do after June, 1924. At about the same time they levied assessments against the capital stock of the company, and used the money so secured, together with the money received from the sale of certificates and from the sale of ores produced in the mine, entirely for operating

purposes, but their operations were all conducted at a loss, so that in March, 1925, all the funds had been used up; the stock of the company had depreciated in value; and it was entirely without resources to proceed further.

In January, 1925, Featherstone and Anderson moved the office of the company. They had been paying $20 a month rent. The new offices cost $100 a month rent. They voted a salary of $300 a month to Featherstone as general manager, and to Mr. Hanson as secretary $200 a month, and $10 to each director for each meeting attended. They had on the pay roll a stenographer and an auditor at $40 a week, making the total expenses of the company in excess of $800 a month. At the time they did this they had ceased operating the mine, and the only work that was being done by the officers or by these employees was an attempted reorganization of the company.

A reorganization was proposed by the Anderson group. Letters were sent out to the stockholders recommending the reorganization and suggesting that their stock, together with proxies binding for six months, be placed in Anderson's hands. Some of the large stockholders at first were in harmony with the proposed reorganization, but, before the plans were completed, refused to proceed with them.

As early as February, 1925, Anderson and Featherstone were negotiating with Rospigliosi to purchase the mortgaged indebtedness at a discount. On May 21, 1925, Anderson and counsel for Rospigliosi reached a tentative agreement, and Anderson made a partial payment thereon. But the agreement was not finally reduced to writing until August 12, 1925.

The substance of that agreement, so far as material to a determination of this case, is as follows: That for $10,000 paid to a trustee Anderson was to acquire the option to buy the notes, mortgage cause of action, and any judgment recovered by Rospigliosi at any time prior to ten days after the sheriff's deed in foreclosure was available to be delivered to the successful bidder, provided no appeal nor litigation

was pending to prevent the issuance of the deed; that, if Anderson exercised the option, he was to pay an additional $24,500 with six months' interest; that Anderson, at sheriff's sale, was to bid the amount of the judgment on the six Rospigliosi notes and on the other $5,000 notes secured by the mortgage; that, if he did not bid as aforesaid or did not pay the balance when the sheriff's deed was available, he then forfeited the $10,000 paid; if it became evident that Anderson could not obtain the sheriff's deed as aforesaid, then the $10,000 was to be returned to him.

While the agreement for the purchase of the mortgage was being arrived at, negotiations were also being conducted between Anderson, the directors of the Glen Allen Mining Company known as the Anderson group, and a number of creditors, for the organization of the defendant Park Galena Mining Company, for the purpose of taking over the Glen Allen mining property after the completion of the foreclosure proceedings and the issuance of the sheriff's deed thereon. About June 1, 1925, the proposed agreement was reduced to writing, signed by Mr. Anderson, and delivered to Mr. Featherstone, who secured the signatures of the other parties to the instrument between June 1st and June 15th, using plaintiff's office for that purpose.

The agreement, after referring to the anticipated foreclosure sale of plaintiff's property, provided that, in consideration of the first party (Anderson) purchasing the property at foreclosure sale, the second parties should pay him 10 per cent of the amount of their claims against the Glen Allen Mining Company, and that the amount of indebtedness due the different parties should be a basis for dividing the stock of the new corporation.

The agreement also provided that a portion of the money so collected should be used by Anderson in the payment of court costs, attorney's fees, and all other expenses reasonably incidental to establishing and enforcing payment of all claims against the Glen Allen Mining Company; that the second parties should assign their claims to a trustee to

reduce them to judgment and compel a sale of the property of the Glen Allen Mining Company to satisfy said judgments and should assign all the property acquired by reason of said claims to the new corporation (Park Galena Mining Company)' at the same time that the party of the first part transferred and conveyed to the new corporation the property acquired under the foreclosure sale.

A portion of the mortgaged property was bid in by Anderson in compliance with the agreement and afterwards conveyed to the Park Galena Mining Company, which was subsequently organized in harmony with the plans outlined in the agreement between Anderson and the creditors and directors of the plaintiff company. The amount bid for the property sold to him by the sheriff at foreclosure was $50,600.90. He presented to the sheriff in satisfaction of his bid the assignment to him of the foreclosure judgment of the Rospigliosi mortgage in the sum of $41,396.50 and $23 costs, an assignment of a judgment entered in favor of the cross-complainant in said action, Helena L. K. Goddard, in the sum of $7,016, and an assignment to him of a judgment entered in favor of the cross-complainant in said action, Joseph Bird, in the sum of $1,628.16 and accrued interest.

In the foreclosure suit, other judgments were entered against the plaintiff herein and in favor of George Blackley, Western Machinery Company, and Morrison-Merrill & Company. At the sale of the portions of plaintiff's property not sold by the sheriff to Anderson, the same were bid in by Morrison-Merrill & Co., and in satisfaction of such bid the purchaser exhibited to the sheriff assignments of the Blackley and Western Machinery judgments. Morrison-Merrill & Co. on July 23, 1926, conveyed the property so purchased by it to the Park Galena Mining Company.

Some time prior to February 24, 1925, the company received from Mr. Stallo his promissory notes in the sum of $3,802.18 in payment of an assessment. These notes, together with accrued interest in the sum of $93.82, were used

by the defendants Anderson and Featherstone as collateral security for a loan made to the company by the National Copper Bank. When the loan matured, Mr. Anderson paid it. The Stallo notes were delivered to, and retained by Mr. Anderson, and he also received the $1,177.36 note of the company payable to him and certificates of indebtedness in the sum of $2,718.64.

Mr. Featherstone, at the time he and Anderson stepped out of control of the company, had taken credit on the books for a total of $28,473.36. He was charged with items amounting to $25,247.28. The balance in his favor was $3,226.08. The credit items included compensation in the sum of $9,260.53, claimed by him to have been earned under the terms of his contract entered into with the company in December 1923. He should have taken credit for $4,444.98. Instead of having a credit, he was in fact indebted to the company.

During the holidays of 1924-25, Featherstone said he was not going ahead on the old contract. If he went further, he was going to have it so he and his crowd controlled it. He said they made arrangements to get control of the mortgage, and that he knew all of the creditors and had all those who had adverse claims on their side; that he was in a position to put it over in the way he wanted it or ruin them by acquiring the property and selling their stock; that he was going to foreclose the mortgage. The plan was to form a new corporation to take over the assets of the Glen Allen Mining Company. He said he did not think Stallo could stand one assessment; one would end King; and three would end Allen. If they did not accept his plan, about the only recourse for ending them was the levying of assessments.

The defendant Anderson testified:

"I know that in the month of February 1925, a special stockholders Meeting was held at Heber City; I know of the regular meeting in May of that year and received notice of the removal of officers. After the meeting in February I was in constant communication with Featherstone, Goddard, and others regarding the affairs of the Glen

Allen Mining Company. From February 1925, to May, I wasn't here much of the time. When I was here, I conferred with Featherstone with respect to the purchase of the mortgage indebtedness of the company. From February 1925 until May I and the other directors felt that to protect my own interest I ought to get control of the Glen Allen Mining Company and its property. I was looking out for myself more than I was for the other fellow because I was a creditor. I conferred with Featherstone, Goddard, Towler, Banks, Hansen and these other parties about what should be done. Between February and the time I got that letter I was negotiating for the purchase of this mortgage myself. I had arrangements made to organize a new company and I proposed afterward to organize a new company in connection with Goddard, Banks, Towler, Soule, Capener, Featherstone, all previous directors of the Glen Allen Mining Company."

On March 4, 1925, Featherstone wrote Mr. Normandy in California relative to an action brought by Stallo to restrain the Anderson board from making a sale of delinquent stock, and the election held at the special meeting in February, concluding with the following language:

"Important legal action must be taken at once, therefore we wish you would come here immediately."

A complaint seeking a receivership of the Glen Allen Mining Company was filed by Normandy in the federal court on March 18, 1925. Relative to this suit Featherstone testified as follows:

"Mr. Normandy did not come here and it was because he didn't come that I called him at San Diego and arranged for the filing of the suit in the Federal Court, the receivership suit. I don't know whether I furnished the attorney the information on which the complaint was based or not. I discussed it with Mr. Walton. I don't know whether any other persons furnished any information to Mr. Walton or not. I was trying to effect a settlement by getting this reorganization through myself and I thought that the filing of this suit for receiver would bring the certificate holders in and the stockholders would be more amenable to the reorganization. I was still trying to get this organization through and I thought this might be a club to make the reluctant stockholders come in. I talked with Mr. Normandy about it. I think I talked with him over the telephone.

He might have been in San Diego at that time. While I was made a defendant in the action with Mr. Anderson and several others, I called Normandy urging him to bring this action asking for a receiver of the Glen Allen Mining Company. This was while I was Vice-President and General Manager of the Company.

"Normandy said he would not put up any money to pay expenses and I employed Mr. E. A. Walton and paid him for bringing this suit."

On April 2, 1925, Featherstone wrote Normandy "in the meantime we are leaving nothing undone to lick the old bunch. Nearly all the certificate holders are intervening in your suit for the appointment of a receiver." And then testified, "By the Old Bunch I meant Allen, King, and Stallo. They are the ones I was going to lick. I was doing everything I could to lick them."

It is impossible to reach any conclusion from the facts in this case other than that early in the year 1924 Anderson and Featherstone determined that they would through the reincorporation of the plaintiff company, and, by assessments levied against the stock, close out the stockholders who were opposing their policies, and that for the accomplishment of these purposes they used their offices as president, directors, and manager of the company.

Featherstone refused to continue the sale of certificates. He took credit for commissions he was not entitled to, and confused the money of the company with his own funds. Although he and his associates owned only a small portion of the stock of the company, he determined to control it in disregard of the desires of the larger stockholders and of the majority. When they refused to consent to the methods proposed, the defendants then threatened to and initiated proceedings to put them out of the company by assessments. They determined and threatened to "lick" the stockholders who would not consent to their plans, and announced that they were doing all they could to that end. Anderson was made president at the instance of Featherstone, and he in turn upheld Featherstone as the manager and authorized and permitted him to perform the office of president in Anderson's absence.

Because they were prevented by legal action brought by a stockholder from getting control by assessments, they determined to buy the Rospigliosi rights under foreclosure, induce the creditors to reduce their claims to judgment, and sell the property under execution.

When the stockholders in special session on February 27th elected a new board, the Anderson group refused to give them the possession of the corporate assets or office, and called the police department to assist them in their resistance. They again refused to give up possession after the election at the regular stockholders' meeting in May, using as their excuse that they desired to compel the new board to ratify the assessments made by them. Although the assessments were ratified at the regular stockholders' meeting in May, still they refused to deliver the office and property to the new board until June 15th, when they resigned, justifying their action upon the ground that certain quo warranto proceedings had not been dismissed. That they were not only holding the corporate offices and property, but that they were attempting to transact corporate business until their resignations on June 15th, is evidenced by the fact that they held directors' meetings, entered, and signed minutes in the corporate records, paid out corporate money and issued stock as occasion required.

Anderson must have known that Featherstone had taken several thousand dollars from the treasury of the company as salary and commission that he was not entitled to, and that such moneys, if applied on the mortgage indebtedness, would have made a material reduction thereof. He consented to and voted for the assessments that Featherstone openly stated would result in ending some of the largest stockholders. He knew that it was Featherstone's purpose to "lick" the stockholders who did not agree to his plans. He consulted with the directors appointed under Featherstone's direction, and decided to protect his own interests as against the other stockholders. Instead of trying to secure an extension of time for the payment of the obliga-

tions of the company, he tried to have a receiver appointed, and he sat with counsel for Normandy in the federal courts where he was petitioning for a receiver upon request of, and under the direction of, Featherstone, who furnished the information and sinews of war to carry on the litigation. While these proceedings were pending, he and Featherstone were negotiating to buy the mortgage rights at a discount, and informed none of the interested parties excepting those who planned for his interest. On February 24, 1925, when he realized that his power was nearing the end, he made loans to the company through Featherstone as trustee, who used the money so secured to pay the salaries created by them after the mining business had been stopped, and when there was nothing being done except the reorganization work, which resulted in placing the entire property in the hands of Anderson and his associates. In return for the money so advanced, he took from the treasury of the company the Stallo notes for the amount of money so loaned and retained them, and also took certificates of indebtedness for the amount by virtue of which he posed as a creditor of the company entitled to protect his own interests, more than the interests of the other stockholders. While they were holding themselves out to the world as officers of the company, and by force retaining their positions as against the duly elected board, Anderson completed his plans to acquire the mortgaged indebtedness, have the foreclosure proceedings concluded and the property purchased, and entered into the contract dated June 16th, whereby he bound the creditors of the corporation to reduce their claims against the corporation to judgment and have any property belonging to the corporation not included in the foreclosure of the mortgage sold under execution and the entire property turned over to the defendant Park Galena Mining Company.

It is urged that the company was insolvent, and that Anderson did not owe any duty to advance the money to take care of the mortgage indebtedness, or to act otherwise

than he did to protect his own interest. It was his duty to use such resources as the plaintiff had to preserve its property and to avoid its sale, if it could be done. Just what would have been the result had he used the moneys which Featherstone was permitted to draw from the treasury in excess of what he was entitled to for the payment of creditors or if he had used his influence to induce creditors to delay reducing their claims to judgment instead of contracting with them to do so cannot be determined. But the president of a company who has reaped advanages from the forced sale of its property brought about by his own activities cannot be excused on the ground that it was helpless. Neither can we tell what would have been the results had Featherstone continued in good faith to complete the sale of the certificates of indebtedness. Whether additional moneys which he may have secured from carrying out his contract, together with the moneys received, would have been sufficient to pay the mortgage, or sufficient of such indebtedness to have secured additional extensions, cannot be answered. Just what general creditors would have done had they seen these officers trying in good faith to carry on, save the institution, and finally pay its obligations, no one knows. But it was undoubtedly the right of the stockholders to expect of their officers that they would use the resources of the company and their influence for the preservation of the property and credit of the corporation. They have just cause of complaint when instead of so doing the officers upon whom they had a right to rely appropriated to their use moneys which should have gone to the payment of debts, urged and contracted with creditors to force execution sales, and out of the ruins so created emerged claiming as their own the property they had sworn by their oaths to protect.

The defendants justify their actions upon the ground that the plaintiff did not recognize them as officers after the day in February when the special election was held.

Upon this question, the defendants state their position as follows:

"In the case at Bar, Anderson was not a director and had no power as a director after the day in February, 1925, when the majority of the stockholders elected a new board. There was open hostility between between the plaintiff, its new board, and Anderson, at least from the date of such election. It is not pretended now by the plaintiff that there was during the time mentioned any fiduciary or any confidential relation in fact.

"Appellant depends upon construction upon construction which is presumption upon presumption."

The legality of the February election did not affect the duties of the board in office and possession while they by force and in the courts refused to recognize the actions of their stockholders, and maintained their right to represent the corporation as its officers, proceeded to the transaction of corporate business, and used the offices of the company to formulate and carry out the plans which finally resulted in the transfer of the property to their own corporation. While they forcibly retained possession of the plaintiff's property, proceeded to transact corporate business, and denied the right of the newly elected board to enter upon their duties as officers of the company, they were burdened with the obligations that follow the offices they were asserting their rights to hold. They cannot be permitted to play fast and loose. It would be contrary to every principle of law or equity for a person to assert his right to act as agent or officer of a corporation, transact business in its behalf, gain information thereby fortifying his own position, and then, when called to account, be permitted to avoid responsibility on the theory that he had not been what he had held himself out to be.

"A person gratuitously or officiously assuming, as agent or trustee, to control or manage the property or interests of another is as firmly bound by the implied terms of his confidential relation as one who is regularly employed and paid." *Nebraska Power Co.* v. *Koenig*, 93 Neb. 68, 139 N. W. 839, 842.

"The directors of a corporation, who hold over, must perform the duties enjoined by law with the same fidelity as regularly elected officers." *Kinard* v. *Ward*, 21 Cal. App. 92, 130 P. 1194, 1195.

Certainly the rule cannot be defeated by the fact that directors hold over by force with the aid of the police officers of the city.

"De facto officers cannot themselves set up the fact that they are not officers de jure to escape liability to the corporation or to creditors for their acts as such or their omissions, or on a bond, or to avoid the doctrine in relation to dealings between an officer and the corporation." Fletcher's Cyc. Corp. § 1852.

"It follows naturally and logically from what has been said heretofore that persons acting as directors or other corporate officers without right, or where they assume to act rightfully by color of office, are subject to all the personal liability which attaches to the rightful incumbents of such offices whether by the common, the equitable, or the statute law." Thompson on Corporations (3rd Ed.) § 1224.

The defendants seek to avoid liability upon the ground that they had in fact ceased to act as officers of the company when the contract for the purchase of the mortgage rights and the agreement with the creditors to force a sale of the company's property by execution were entered into. But that alone is not enough to relieve them. They learned of the prospective values of the property and added to the financial embarrassment of the plaintiff while they were officers. During that time they developed and put in motion the plans that resulted in each of those contracts; they determined during that period to "lick" the stockholders who would not join them in their operating plans; and used these contracts, conceived and matured while they were yet forcibly holding office, if not while they were officers in law, as a means of accomplishing these purposes. Although they were able to purchase the mortgage rights at a large discount, they kept the information from all excepting their own associates, and carried on their negotiations while they were still on the pay roll of the plaintiff. Under such conditions, an officer

cannot avoid responsibility for violating his duties as a fiduciary merely by delaying the final execution of a contract until the expiration of his relations. The rule governing such a situation is well stated in *Trice* v. *Comstock* (C. C. A.) 121 F. 620, 625, 61 L. R. A. 176, as follows:

"Nor is it any defense to the suit to enforce this trust that the agency had terminated before the confidence was violated. The duty of an attorney to be true to his client, or of an agent to be faillthful to his principal, does not cease when the employment ends, and it cannot be renounced at will by the termination of the relation. It is as sacred and inviolable after as before the expiration of its term."

The defendants seem to be of opinion that, because they were not possessed of money belonging to the plaintiff with which to pay the mortgaged indebtedness, they were not under obligation. Their position upon this question is stated in their brief as follows:

"They did not use the company's money but they used their own and the liability to pay the Prince's mortgage or to lose the equity of redemption was not increased one iota by the fact that there was a change in the person of the mortgagee creditor.

"These people who put the money up, including Anderson, we repeat, did not use company's money; neither did they have in their hands money so as to make it the duty of any of them to pay or purchase with the company funds, and none of the counsel has cited a single authority holding that in such circumstances these creditors violated any duty in purchasing for themselves."

But the doctrine announced in *Trice* v. *Comstock,* supra, is a complete answer to such contention. In that case Comstock, after acquiring the information that induced him to act later, notified the complainants that he would bring no more customers to Barton county, and that all relations between them had ceased. At no time did Comstock have under his control any moneys belonging to the complainants with which to purchase or negotiate for the purchase of the lands. Neither was he under any direct obligation to advance funds with which to make purchases. These are not, and ought not be, the conditions that control. The essence of the wrong was in the acquiring of information while the

relation of confidence existed, terminating the relation and immediately thereafter using the information so acquired against the interest of his correlate. Justice Sanborn says:

"For reasons of public policy, founded in a profound knowledge of the human intellect and of the motives that inspire the action of men, the law peremptorily forbids every one who, in a fiduciary relation, has acquired information concerning or interest in the business or property of his correlate from using that knowledge or interest to prevent the latter from accomplishing the purpose of the relation."

Anderson and his board of directors had been made the officers of the plaintiff company at the instance of Featherstone upon the representation that, if it were done, he would be able to interest capital and relieve the company of the situation it was in. Instead of doing this, the results of their one year in office were to increase the debts, add to the operating expenses, consume the assets, misappropriate funds, induce creditors to sue out executions, strengthen their own positions by purchasing secured claims at a discount, and then, when they are asked to account, assert that they were under no obligation to protect the interests of the company, and that they were free to purchase for themselves because they did not have in their hands moneys of the company to pay the obligation. Argument is unnecessary to show the fallacy of such a position.

The authorities everywhere recognize the rule that, where a fiduciary relation is shown to exist, the burden is upon the fiduciary to show good faith and fair dealing in his relations with his cestui que trust. It is frequently said that the relation of a director to his corporation is not that of trustee and cestui que trust. But it does not follow from that statement that the director is not bound by the same rules of good faith, full disclosure, and fair dealing as surrounds the trustee in dealing with the cestui que trust. As agents intrusted with the management of the corporation for the benefit of the stockholders and creditors, they occupy a fiduciary relation, and are held liable to the corporation as trustees. The liability of directors and

other officers to the corporation is determined by substantially the same principles which determine the liability of any other agent to his principal for failure to perform the duties which he has undertaken.

Pomeroy in his work on Equity Jurisprudence, § 1077, states the rules as follows:

"As long as the confidential relation lasts the trustee or other fiduciary owes an undivided duty to his beneficiary, and cannot place himself in any other position which would subject him to conflicting duties or expose him to the temptation of acting contrary to the best interests of his original cestui que trust. The rule applies alike to agents, partners, guardians, executors, and administrators directing and managing officers of corporations as well as to technical trustees. The most important phase of this rule is that which forbids trustees and other fiduciaries from dealing in their own behalf with respect to matters involved in the trust, and this prohibition operates irrespectively of the good faith or bad faith of such dealing."

In 4 Fletcher, Cyc. Corp. § 2272, the duties of directors to the corporation are stated as follows:

"Directors and other officers must exercise the utmost good faith in all transactions touching their duties to the corporation and its property. * * *

"All their acts must be for the benefit of the corporation and not for their own benefit, except as hereinafter stated. They are not permitted to profit as individuals by virtue of their position.

"Any profits received by them from the company's property or business belongs to the company, and they hold the same as trustees for the benefit of the corporation and its stockholders." See also §§2261-2264.

In *Elggren* v. *Woolley*, 64 Utah 183, 228 P. 906, 910, this court said:

"Courts cannot sanction any act on the part of directors of corporations (who in this jurisdiction possess and exercise all the powers vested in corporations) which is not fair, just, and equitable to all of the stockholders, and that is especially true where, as in this case, the corporation is in financial difficulties. In the present age most all business enterprises are conducted and controlled by corporations through their directors and officers. If the door is once opened so that

the officers who are in charge of the affairs of corporate entities can by secret agreements with creditors or with others protect their own interests to the detriment of the corporation and the stockholders, then the transaction of business by corporations will soon come to an end."

The defendants urge that the purchase by Anderson was valid because he was a good-faith creditor, and that he made his purchase, when he was dealing at arm's length with the plaintiff several months after he had ceased to act as president of the plaintiff corporation, with his own funds. In support of their position they cite 4 Fletcher, Corporations, §§ 2288-2290:

Undoubtedly many conditions arise in the transaction of corporate business where it would be contrary to good business and public policy to prevent officers of a corporation from contracting with it and securing themselves against loss. In *Harts* v. *Brown,* 77 Ill. 226, the court held that, where a corporation was insolvent and without means to discharge the indebtedness or redeem the property sold at judicial sale, and the directors gave the stockholders an opportunity of making advancements to relieve the corporation, which they refused, the directors had the right to purchase the indebtedness, foreclose the trust deed securing the same, and acquire the property.

In *Twin-Lick Oil Co.* v. *Marbury,* 91 U. S. 587, 23 L. Ed. 328, it was held that title acquired by the directors by the purchase of corporate property at a foreclosure sale under their own mortgage was good as against stockholders who, after standing by and refusing assistance when the corporation was in peril, attacked the title of directors after they had reorganized and made the corporation prosperous. Numerous other illustrations of the application of the principle are referred to in 2 Thompson on Corporations, § 1358. But in all the cases upholding purchases of corporate property by officers at judicial sale or otherwise, and as well stated in the citation from Fletcher

relied on by the defense, the question to be determined is whether the officer acted fairly and in good faith throughout the entire transaction. Wherever there is collision between trust, duty, and personal interest, purchase of corporate property by officers is forbidden.

The duty of the directors of a corporation is to further the interests and business of the association and to conserve its property. Any action on the part of directors looking to the impairment of corporate rights, the sacrifice of corporate interests, the retardation of the objects of the corporation, and more especially the destruction of the corporation itself, will be regarded as a flagrant breach of trust on the part of the directors engaged therein. 2 Thompson on Corporations, 1327.

For several months the interest of these defendants were in direct collision with their duties as officers of the company. During that time, the plans were laid and matured which finally culminated in the property of the plaintiff passing to the defendants. Under these conditions, the fact that the contracts were not actually reduced to writing or the sheriff's sale made until some time after the defendants ceased to act as officers of the company cannot affect the situation. The good faith and fairness of the entire transaction must be measured by the circumstances existing while they were yet in office.

Plaintiff is of the opinion that the property should be conveyed to it by the defendants without compensation, but with this we cannot agree. The rule of law applicable to the facts in this case is well stated in 2 Thompson on Corporations, as follows:

"The rule granting relief to the corporation and stockholders where a director makes a contract with himself or where he secures some advantage or profit, is not to be used to the injury of the director where such contract is free from actual fraud. The rule was adopted for the purpose of securing justice and not to work injustice. In attempting to prevent a wrong, it is not the intention of the law to substitute one wrong for another. Hence, certain limitations have

been placed upon the operation of the rule, intended to guard against evil consequences as inequitable as those it was designed to prevent. Upon this theory it has been accordingly held that where the contract is free from actual fraud, while the beneficiary, the corporation or stockholders, may avoid such a contract made by the director or trustee, it cannot be done without restoring to him what he has paid. * * * 'To cling to the fruits of the trustees dealings while seeking to avoid his act; * * * would be grossly inequitable and unjust. It would turn a rule designed as a protection, into a weapon of offense and injustice.' " 2 Thompson on Corporations (2d Ed.) § 1256.

When Anderson ascertained that he could purchase the mortgaged indebtedness at a substantial discount, he very clearly owed the plaintiff and its stockholders the duty to inform them of the opportunity so to do and to give the stockholders, if they desired, the chance to take advantage of the offer. To inform the manager, Featherstone, and the directors who were acting in unison with him, was insufficient. Under these conditions he is not entitled to retain the profits. To permit him to do so would be to permit his personal interest to overcome his duty to the corporation.

We are of the opinion that the judgment should be reversed, and the cause remanded to the district court, with directions to take an accounting between these parties, and, upon payment of such sum as shall be found to be due from the corporation to the defendants, that they be required to convey the described property to the plaintiff. But under the facts of the case we think plaintiff should be allowed one year after the judgment becomes final in which to make such payment. Such is the order. Costs to appellant.

CHERRY, C. J., and STRAUP, FOLLAND, and EPHRAIM HANSON, JJ., concur.

ELIAS HANSEN, J., being disqualified, did not participate herein.